246 N.J. Super. 79 (1991)
586 A.2d 1300
IN THE MATTER OF ALLEGATIONS OF VIOLATIONS OF LAW AND THE NEW JERSEY ADMINISTRATIVE CODE BY RECYCLING & SALVAGE CORPORATION; RECYCLING CENTER OF NEW JERSEY; HAULAWAY, INC.; GOLDEN GATE CARTING COMPANY, INC.; WILLIAM MAJOR; CHRISTOPHER YONCLAS AND JOSEPH SCUGOZA.
Superior Court of New Jersey, Appellate Division.
Submitted November 20, 1990.
Decided February 1, 1991.
*83 Before Judges MICHELS, BRODY and D'ANNUNZIO.
John J. Pribish, attorney for appellants Recycling & Salvage Corporation, Recycling Center of New Jersey, William Major, Christopher Yonclas and Joseph Scugoza (John J. Pribish and Adrienne C. Rogove, on the briefs).
Robert J. Del Tufo, Attorney General of New Jersey, attorney for respondent New Jersey Board of Public Utilities (Andrea M. Silkowitz, Assistant Attorney General, of counsel; Susan J. Vercheak, Deputy Attorney General, on the brief).
The opinion of the court was delivered by MICHELS, P.J.A.D.
Appellants Recycling & Salvage Corporation (Recycling & Salvage), Recycling Center of New Jersey (Recycling Center), William Major (Major), Christopher Yonclas (Yonclas) and Joseph Scugoza (Scugoza) appeal from a final administrative action of respondent New Jersey Board of Public Utilities (Board), dated February 9, 1990 that, in part, (1) ordered Recycling & Salvage not to resume operation of a solid waste transfer station at 170-180 Frelinghuysen Avenue, Newark, New Jersey and not to operate a solid waste transfer station in New Jersey unless it obtained a certificate of public convenience *84 and necessity (certificate) for such utility as required by N.J.S.A. 48:13A-6(a); (2) ordered Recycling Center, which did not hold a certificate, to cease collecting solid waste and to collect only source separated nonputrescible materials as defined in N.J.S.A. 13:1E-99.12 and as required by N.J.S.A. 13:1E-99.34(b); (3) ordered Recycling Center to immediately comply with all applicable waste flow orders and rules, that is, ordered any residual waste generated by Recycling Center's operation to be disposed of at the designated Essex County transfer station pursuant to N.J.A.C. 7:26-6.1 et seq.; and (4) imposed penalties totaling $771,000 for the unlicensed operation of a transfer station in violation of the Solid Waste Utility Control Act.
By way of background, this matter arose as an administrative enforcement action brought by the staff of the Board against Recycling & Salvage and Recycling Center. In May 1988, the Board issued an administrative order to show cause and an order of investigation against Recycling & Salvage, Recycling Center, Haulaway, Inc., Golden Gate Carting Company, Inc., Major, Yonclas and Scugoza. In essence, the order to show cause alleged that Recycling & Salvage and Recycling Center engaged in solid waste collection and disposal without the requisite utility authorization and that they violated waste flow rules and redirection orders. The order sought cessation of those activities, as well as sanctions. The Board referred the order, together with Recycling & Salvage's application for a certificate to operate as a solid waste utility, to the Office of Administrative Law.
In July 1988, the Board's staff filed a motion with the Board alleging that appellants were continuing unlawful activities by operating as unlicensed solid waste utilities during the pendency of the case. Accordingly, the Board's staff sought a cease and desist order. The Board decided to hear the application itself, and on August 30, 1989 after several days of hearings, the Board ordered Recycling & Salvage to cease unlicensed solid waste utility operations as a transfer station and ordered *85 Recycling Center not to resume solid waste operations until it obtained a certificate. By an order dated October 24, 1989, the Board denied appellants' motions for reconsideration and for a stay.
In October 1989, while this matter was pending before the Board, appellants instituted an action against the Board in the United States District Court for the District of New Jersey, seeking, inter alia, a preliminary injunction staying the Board's order of August 30, 1989. The District Court dismissed the action on abstention grounds, and the United States Court of Appeals for the Third Circuit refused to entertain an application for a stay.
Having failed to obtain relief in federal court, appellants sought interlocutory relief in state court. In November 1989, we denied appellants' motions for a stay and for leave to appeal. Thereafter, the New Jersey Supreme Court also denied appellants' motion for a stay but directed the Board to accelerate the remainder of the administrative proceeding. The Supreme Court subsequently denied a motion for reconsideration.
A plenary administrative hearing on the remainder of the case, beyond the cease and desist order, was scheduled before an Administrative Law Judge. In December 1989, Recycling & Salvage withdrew its application for a certificate, and the Board's staff withdrew a charge involving Haulaway, Inc.'s use of utility equipment. Furthermore, the parties stipulated that the record developed before the Board on the cease and desist application would be the record before the Administrative Law Judge. Before the Administrative Law Judge could consider the record, appellants successfully sought to have the entire matter returned to the Board. On February 9, 1990, the Board issued its final decision. Appellants appealed. The Board denied appellants' motion for a stay pending appeal, and we too denied the motion.
The Board then moved to compel appellants to file a supersedeas bond in the full amount of the penalties imposed. We *86 directed the Board to determine the amount of the bond and the sufficiency of the surety. The Board considered the matter and ordered appellants to post a supersedeas bond in the full amount of the penalties. Appellants moved for a stay of the bond requirement. In July 1990, we directed the Board to review appellants' offer of a property bond with sufficient equity in lieu of a cash bond, and we further directed that if the issue was not expeditiously resolved, either party could reapply for further consideration of the bond requirement. Neither party reapplied for further consideration.
Appellants now seek a reversal of the Board's final administrative action. Appellants Recycling Center and its sole owner Scugoza contend that (1) there is no evidence to support the conclusion of integration and commingling of the waste materials; (2) Recycling Center reasonably relied on the "Residue Rule" as articulated by the Board and the Department of Environmental Protection (DEP); (3) there is no evidence to support assessment of liability against Scugoza; (4) there is no evidence to support the fine against Recycling Center for the time period alleged, and (5) there is no evidence to support an assessment of penalties against Recycling Center pursuant to N.J.S.A. 48:13A-12 and such penalties constitute a violation of the ex post facto clause. Appellant Yonclas contends that there is no evidence to support the conclusion that he managed or operated the Recycling & Salvage transfer station. Finally, appellants Recycling & Salvage and its sole owner Major contend that (1) the February 7, 1990 order requiring it to obtain a certificate before engaging in interstate commerce violates the United States Constitution; (2) the requirements for obtaining a certificate are overly broad and burdensome and inhibit the free flow of commerce in violation of the commerce and contract clauses of the United States Constitution; (3) the Board's regulation of its operations constitutes a taking without just compensation in violation of the fifth amendment to the United States Constitution and article I, paragraph 20 of the New Jersey Constitution; (4) Recycling & Salvage is not a public *87 utility within the meaning of the Public Utilities Law; (5) the Board lacks jurisdiction over interstate commerce; (6) the Board's consideration of extrinsic evidence and the use of that evidence to control its conclusion in the August 30, 1989 and February 9, 1990 orders violates due process, (7) there is no evidence to support an assessment of penalties against them pursuant to N.J.S.A. 48:13A-12 and (8) such penalties constitute a violation of the ex post facto clause.
We emphasize that our role in reviewing the Board's findings and conclusions is to determine "`whether the findings made could reasonably have been reached on sufficient credible evidence present in the record', considering `the proofs as a whole,' with due regard to the opportunity of the one who heard the witnesses to judge of their credibility ... and ... with due regard also to the agency's expertise where such expertise is a pertinent factor." Mayflower Sec. Co., Inc. v. Bureau of Sec., 64 N.J. 85, 92-93, 312 A.2d 497 (1973) (quoting Close v. Kordulak Bros., 44 N.J. 589, 599, 210 A.2d 753 (1965)). See also In re Suspension of Heller, 73 N.J. 292, 309, 374 A.2d 1191 (1977); Jackson v. Concord Co., 54 N.J. 113, 117-18, 253 A.2d 793 (1969). We are satisfied that such evidence appears in the record.
Furthermore, it is not our function to substitute our independent judgment for that of an administrative agency, such as the Board, where there may exist a difference of opinion concerning the evidential persuasiveness of the relevant proofs. First Sav. & Loan Ass'n of E. Patterson v. Howell, 87 N.J. Super. 318, 321-22, 209 A.2d 343 (App.Div. 1965), certif. denied, 49 N.J. 368, 230 A.2d 400 (1967). As a reviewing court, we will not weigh the evidence, determine the credibility of witnesses, draw inferences and conclusions from the evidence or resolve conflicts therein. De Vitis v. New Jersey Racing Comm'n, 202 N.J. Super. 484, 489-90, 495 A.2d 457 (App.Div.), certif. denied, 102 N.J. 337, 508 A.2d 213 (1985). See In re Grossman, 127 *88 N.J. Super. 13, 23, 316 A.2d 39 (App.Div.), certif. denied, 65 N.J. 292, 321 A.2d 253 (1974).
We are satisfied from our careful study of the voluminous record and the arguments presented that the final administrative action of the Board was not arbitrary, capricious or unreasonable, that it was supported by the evidence, and that it did not violate legislative policies expressed or fairly implied in the statutory scheme administered by the Board. See Henry v. Rahway State Prison, 81 N.J. 571, 579-80, 410 A.2d 686 (1980); Campbell v. Department of Civil Serv., 39 N.J. 556, 562, 189 A.2d 712 (1963); In re Fiorillo Bros. of N.J., Inc., 242 N.J. Super. 667, 675-76, 577 A.2d 1316 (App.Div.), certif. denied, 122 N.J. 363, 585 A.2d 371 (1990); In re Waste Disposal Agreement, 237 N.J. Super. 516, 526-29, 568 A.2d 547 (App.Div. 1990). See also Department of the Pub. Advocate v. Board of Pub. Utils. & Hackensack Water Co., 189 N.J. Super. 491, 499, 460 A.2d 1057 (App.Div. 1983); In re Application of Boardwalk Regency Corp. for a Casino License, 180 N.J. Super. 324, 333-35, 434 A.2d 1111 (App.Div. 1981), modified, 90 N.J. 361, 447 A.2d 1335, appeal dismissed sub. nom. Perlman v. Attorney Gen. of N.J., 459 U.S. 1081, 103 S.Ct. 562, 74 L.Ed.2d 927 (1982). Moreover, all of the issues of law raised by all appellants are clearly without merit. R. 2:11-3(e)(1)(E). However, further comment is appropriate with respect to some of appellants' contentions.

I.
It is fundamental that "`the meaning of a statute must ... be sought in the language in which the act is framed, and if that is plain ... the sole function of the courts is to enforce it according to its terms.'" Sheeran v. Nationwide Mut. Ins. Co., Inc., 80 N.J. 548, 556, 404 A.2d 625 (1979) (quoting Caminetti v. United States, 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442, 452 (1917)). See, e.g., Vreeland v. Byrne, 72 N.J. 292, 302, 370 A.2d 825 (1977); DeHart v. Bambrick, 177 N.J. *89 Super. 541, 549, 427 A.2d 113 (App.Div. 1981); 2A Sutherland Stat. Const., § 22.29 at 263 (4th ed. 1985).
With these principles in mind, we have no hesitancy in concluding that the Board properly determined that Recycling Center, contrary to its and Scugoza's claim, is not a recycling facility within the meaning of N.J.S.A. 13:1E-99.12 but instead, is engaged in solid waste collection and therefore, is subject to the Board's jurisdiction. N.J.S.A. 13:1E-99.12 defines "Recycling Center" as
any facility designed and operated solely for receiving, storing, processing and transferring source separated, nonputrescible or source separated commingled nonputrescible metal, glass, paper, plastic containers, and corrugated and other cardboard, or other recyclable materials approved by the department. [Emphasis added].
To qualify as a recycling center exempt from the DEP's and Board's jurisdiction, a recycling facility must receive only source separated recyclable materials. The facility cannot receive any waste materials. Here, the evidence demonstrates that a substantial tonnage of waste material was brought into and taken from the facility for disposal in out-of-state landfills. Therefore, the facility is a transfer station as defined by N.J.S.A. 13:1E-3(r). That statute provides:
"Transfer station" means a solid waste facility at which solid waste is transferred from a solid waste collection vehicle to a solid waste haulage vehicle for transportation to a sanitary landfill facility, resource recovery facility, or other destination. [N.J.S.A. 13:1E-3(r)].
As such, the facility is subject to the DEP's and Board's jurisdiction.
The Legislature's intent to limit recycling centers exempted from registration to those facilities that receive only source separated recyclable materials enumerated by statute, or facilities which obtain the DEP's approval for other materials they receive, is demonstrated clearly by N.J.S.A. 13:1E-99.34(b). That statute provides:
No recycling center shall receive, store, process or transfer any waste material other than source separated nonputrescible or source separated commingled nonputrescible metal, glass, paper, or plastic containers, and corrugated and *90 other cardboard without the prior approval of the department. [N.J.S.A. 13:1E-99.34(b)].
This statute is essentially prohibitive, forbidding any recycling facility from receiving waste without the DEP's approval, except for items listed in the statute such as source separated nonputrescible metal and glass. Thus, N.J.S.A. 13:1E-99.34(b) does not require the DEP to generically approve a list of wastes for receipt by recycling facilities. Rather, the statute clearly authorizes the DEP to require each individual facility to obtain approval from the DEP to receive waste, with the exception of those items listed in the statute. N.J.S.A. 13:1E-99.34(b). This individualized approval process is consistent with the legislative understanding that other source separated materials, though capable of being recycled, may not be as innocuous as the materials listed in the statute and should be assessed by the DEP as to the environmental effect of their processing at a particular facility.
In addition, Recycling Center and Scugoza imply that the use of "commingled" in the phrase "other than source separated nonputrescible or source separated commingled nonputrescible metal, glass, paper, or plastic containers, and corrugated and other cardboard...." in N.J.S.A. 13:1E-99.34(b) means that these materials may be accepted without the DEP's approval, even if not separated. While the statute applies to "source separated commingled" materials, Recycling Center and Scugoza seek to read the source separation requirement out of N.J.S.A. 13:1E-99.34(b). N.J.S.A. 13:1E-99.12 defines "source separated recyclable materials" as recyclable materials that "are kept separate and apart from residential, commercial and institutional solid waste by the generator thereof for the purposes of collection, disposition and recycling." (emphasis supplied). Thus, separation must occur before these items are brought to the recycling facility. The use of "commingled" does not remove the source separation requirement from the statute; it merely authorizes recycling centers to accept source *91 separated materials that have been commingled with each other.
As Recycling Center is not a recycling facility within the meaning of N.J.S.A. 13:1E-99.12 but instead, is a transfer station as defined by N.J.S.A. 13:1E-3(r), Recycling Center is subject to the requirements of N.J.S.A. 13:1E-26. N.J.S.A. 13:1E-26 provides that before construction, management or operation of any solid waste facility, the approval of the Commissioner must first be obtained. To obtain a solid waste facility permit, the facility must submit engineering studies and designs for the Commissioner's approval. N.J.S.A. 13:1E-26. Further, any solid waste facility constructed, acquired or operated under the Solid Waste Management Act is deemed a public utility and is subject to the rules and regulations of the Solid Waste Utility Control Act of 1970. N.J.S.A. 13:1E-27; N.J.S.A. 48:13A-1 et seq.
Finally, the intertwined operations at Frelinghuysen Avenue make lawful regulation of the facility impossible. The evidence discloses nothing less than a full-service solid waste operation at Frelinghuysen Avenue. The facility is marked for the public by signs labeled "Recycling Center of New Jersey." Recycling Center pays all of the employees, and the employees take their direction from Recycling Center's owner Scugoza. Waste mingling between Recycling Center and Recycling & Salvage sometimes occurred because trucks dumped day and night in piles in the same large area. Moreover, the residue from each operation was treated and baled together for shipment out-of-state. This clearly was one operation, subject to the Board's jurisdiction.

II.
Appellants Recycling & Salvage and Major contend that the Board's decision was flawed because extrinsic evidence formed the basis for the Board's reconsideration of its first oral ruling on the cease and desist application. The argument *92 centers on remarks made by Board President Christine Todd Whitman at the August 9, 1989 agenda meeting regarding the serious problems in allowing the continued operation of an unregulated solid waste transfer station. President Whitman stated that she witnessed the "tragic consequences" of such illegal operations and therefore, was convinced that the Board should reconsider its earlier oral order declining the staff's request for a cease and desist order.
The reference by President Whitman apparently was to the widely publicized damage to a state highway caused by a fire on August 7, 1989 at the HUB Recycling Center in Newark, New Jersey, which allegedly operated an illegal transfer station below the roadway. Recycling & Salvage and Major argue that they were denied due process because the Board "reversed itself" on the basis of information relating to the HUB incident which was not part of the record in this case. Recycling & Salvage and Major further claim that they were denied the opportunity to rebut or explain the consideration which led to the Board's decision. We disagree.
First, the Board based its decision entirely on evidence in the record and that evidence overwhelmingly supports its findings and conclusions. Substantial evidence in the record demonstrated the need to shut down operations at the Frelinghuysen Avenue location. For example, the proofs show that Recycling Center, a wholly unlicensed waste operator, picked up and disposed of solid waste from New Jersey and elsewhere under the guise of recycling, and Recycling & Salvage accepted waste from out-of-state. Further, Recycling Center and Recycling & Salvage shared the same, undivided tipping floor. Thus, Recycling Center and Recycling & Salvage conducted an illegal operation at the Frelinghuysen Avenue location and immediate action by the Board was necessary. See generally State ex rel. Bd. of Health of N.J. v. Diamond Paper Mills Co., 63 N.J. Eq. 111, 118-19, 51 A. 1019 (Ch.), aff'd o.b., 64 N.J. Eq. 793, 53 A. 1125 (E. & A. 1902).
*93 Moreover, we emphasize that there was nothing inappropriate in President Whitman's remarks. She did not say it was necessary to grant the staff's request to issue a cease and desist order because of the HUB incident. She simply referred to the incident to underscore the need to reconsider the staff's request in this case. The HUB incident gave rise only to the Board's decision to reexamine the record. The decision clearly demonstrates that the Board based its determination only on matters properly before it.
Given the Board's responsibilities with regard to the regulation of solid waste disposal, the Board appropriately determined that a decision on this matter could not be delayed until the Administrative Law Judge heard and decided the matter. Further, N.J.S.A. 48:2-40 provides that "[t]he Board at any time may order a rehearing and extend, revoke or modify an order made by it." Thus, the Board properly exercised its authority under N.J.S.A. 48:2-40 in reexamining the record and reconsidering the staff's application. See Township of Deptford v. Woodbury Terrace Sewerage Corp., 54 N.J. 418, 425, 255 A.2d 737 (1969); New Jersey Bell Tel. Co. v. Department of Pub. Utils., Bd. of Pub. Util. Comm'rs, 12 N.J. 568, 578-79, 97 A.2d 602 (1953); Sudler v. Environmental Disposal Corp., 219 N.J. Super. 52, 62, 529 A.2d 1022 (App.Div.), certif. denied, 109 N.J. 56, 532 A.2d 1119 (1987).

III.
Contrary to Recycling & Salvage's and Major's claim, the Board's order requiring Recycling & Salvage to obtain a certificate in compliance with N.J.S.A. 48:13A-6(a) does not violate the commerce clause of the United States Constitution. The commerce clause grants Congress the power "[t]o regulate Commerce ... among the several States...." U.S. Const. art. I, § 8, cl. 3. In the absence, however, of conflicting federal legislation, "`there is a residuum of power in the state to make laws governing matters of local concern which nevertheless in *94 some measure affect interstate commerce or even, to some extent, regulate it.'" Kassel v. Consolidated Freightways Corp., 450 U.S. 662, 669, 101 S.Ct. 1309, 1316, 67 L.Ed.2d 580, 586 (1981) (quoting Southern Pacific Co. v. Arizona, 325 U.S. 761, 767, 65 S.Ct. 1515, 1519, 89 L.Ed. 1915 (1945)). It is clear that the interstate trade in garbage is protected by the commerce clause. City of Philadelphia v. New Jersey, 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978). Generally, a state regulation subjected to commerce clause attack will be sustained if it is rationally related to a legitimate state end and if the state interest in enforcing the regulation outweighs the burden imposed on interstate commerce. Borough of Glassboro v. Gloucester County Bd. of Chosen Freeholders, 100 N.J. 134, 143, 495 A.2d 49, cert. denied, 474 U.S. 1008, 106 S.Ct. 532, 88 L.Ed.2d 464 (1985). See also In re Waste Disposal Agreement, 237 N.J. Super. at 530-31, 568 A.2d 547. Commerce clause analysis, of course, requires balancing the national need for the free flow of trade among the various states against the local need of individual states to protect the health, safety and welfare of their citizens.
Modern commerce clause analysis often begins with Pike v. Bruce Church, Inc., 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970). The Supreme Court set forth the following test for evaluating whether statutes are in conflict with the commerce clause:
Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.... If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities. [Id. at 142, 90 S.Ct. at 847, 25 L.Ed.2d at 178 (citation omitted)].
Recycling & Salvage argues that the requirements for obtaining a certificate are overly broad and burdensome, thereby inhibiting the free flow of commerce. N.J.S.A. 48:13A-6(a) provides:

*95 No person shall engage, or be permitted to engage, in the business of solid waste collection or solid waste disposal until found by the board to be qualified by experience, training or education to engage in such business, is able to furnish proof of financial responsibility, and holds a certificate of public convenience and necessity issued by the Board of Public Utilities. No certificate shall be issued for solid waste collection or solid waste disposal until the proposed collection or disposal system has been registered with and approved by the State Department of Environmental Protection as provided by section 5 of P.L. 1970, c. 39 (C.13:1E-5).
Before analyzing this case under the Pike standard, it is important to note that the United States Supreme Court has repeatedly indicated that a legitimate, nondiscriminatory exercise of the police power is not barred by the commerce clause because it might indirectly affect interstate commerce. See Head v. New Mexico Bd. of Examiners in Optometry, 374 U.S. 424, 428-29, 83 S.Ct. 1759, 1762-63, 10 L.Ed.2d 983, 987-88 (1963). The balancing requires "a sensitive consideration of the weight and nature of the state regulatory concern in light of the extent of the burden imposed on the course of interstate commerce." Raymond Motor Transp., Inc. v. Rice, 434 U.S. 429, 441, 98 S.Ct. 787, 794, 54 L.Ed.2d 664, 675 (1978); Borough of Glassboro v. Gloucester County Bd. of Chosen Freeholders, 100 N.J. at 142-48, 495 A.2d 49.
At the outset, the court must examine whether N.J.S.A. 48:13A-6(a), either on its face or in effect, discriminates against interstate commerce or whether the statute regulates evenhandedly with only incidental effects on interstate commerce. Determination of a statute's facial validity requires an evaluation of whether the statutory language expresses more favorable treatment to in-state entities. In Hughes v. Oklahoma, 441 U.S. 322, 337, 99 S.Ct. 1727, 1736, 60 L.Ed.2d 250, 262 (1979), a statute that expressly prohibited the transportation of live minnows out of Oklahoma "on its face discriminate[d] against interstate commerce," and was therefore subject to "the strictest scrutiny." N.J.S.A. 48:13A-6(a) suffers from no such defect. Clearly, the requirement that all solid waste disposal facilities operating as public utilities be licensed applies equally to all facilities, regardless of the waste's origin. Therefore, *96 N.J.S.A. 48:13A-6(a) does not discriminate against interstate commerce on its face.
Next, the court must ascertain whether N.J.S.A. 48:13A-6(a), in practical effect, discriminates against interstate commerce. As to the effect on interstate commerce, discrimination in favor of Recycling & Salvage over other New Jersey facilities will occur if the court exempts Recycling & Salvage from the certification requirement. In Accountemps Div. of Robert Half of Philadelphia, Inc. v. Birch Tree Group, Ltd., 115 N.J. 614, 560 A.2d 663 (1989), the New Jersey Supreme Court upheld, over a commerce clause challenge, a state statute requiring the registration of out-of-state employment agencies doing business within New Jersey. The State's strong interest in regulating solid waste transfer stations within New Jersey is even more compelling. See Trade Waste Management Ass'n, Inc. v. Hughey, 780 F.2d 221 (3d Cir.1985) (provision of N.J.S.A. 13:1E-133(a), regulating disposal of solid and hazardous waste, which permitted issuance of licenses only to those persons who exhibited "sufficient reliability, expertise and competency" held constitutional).
As implemented, N.J.S.A. 48:13A-6(a) poses no flat prohibition against the certification of facilities that handle out-of-state waste. The statute does not curtail the movement of waste into or out of New Jersey. It is merely a measure, supported by health and safety considerations, to ensure that responsible individuals and entities engage in the solid waste disposal business. See Matter of Scioscia, 216 N.J. Super. 644, 655-56, 524 A.2d 855 (App.Div.), certif. denied, 107 N.J. 652, 527 A.2d 471 (1987). The statute imposes only incidental effects upon interstate commerce and may, therefore, be upheld unless the burden imposed "is clearly excessive in relation to the putative local benefits." Pike, 397 U.S. at 142, 90 S.Ct. at 847, 25 L.Ed.2d at 178 (citation omitted).
The Legislature promulgated the Solid Waste Utility Control Act because

*97 the collection, disposal and utilization of solid waste is a matter of grave concern to all citizens and is an activity thoroughly affected with the public interest; that the health, safety and welfare of the people of this State require efficient and reasonable solid waste collection, disposal and utilization service; that such service will more likely be achieved if the Public Utility Commission is charged with the duty of setting and enforcing standards and rates for regulating economic aspects of solid waste collection, disposal and utilization service; and that the exercise of any power herein provided for shall be deemed to be in the public interest and for a public purpose. [N.J.S.A. 48:13A-2].
Thus, the Act's putative local benefits include the provision that the Board set and enforce standards in solid waste collection. The Legislature expressly charged both the Board and the DEP with ensuring that waste facilities meet certification standards. While the DEP focuses on environmental concerns and the Board focuses on economic concerns, these concerns overlap. The Board may not license an operation unless the applicant possesses a DEP license. N.J.S.A. 48:13A-6. The Board may consider violations of environmental laws in determining whether to revoke a license. N.J.S.A. 48:13A-9(b). Furthermore, the Legislature charged both the Board and the DEP with licensing only those individuals and entities who can be entrusted with the responsibility of proper solid waste disposal. N.J.S.A. 48:13A-6; N.J.S.A. 13:1E-4. As our Supreme Court noted in A.A. Mastrangelo, Inc. v. Department of Envtl. Protection, 90 N.J. 666, 681, 449 A.2d 516 (1982), "[i]t is evident from the Utility Act and the Solid Waste Management Act that the legislature envisioned complementary functions for DEP and BPU...." Case law indicates that solid waste problems are a legitimate local concern when state regulations addressing those problems are attacked under the commerce clause. See e.g., Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456, 101 S.Ct. 715, 66 L.Ed.2d 659, reh'g denied, 450 U.S. 1027, 101 S.Ct. 1735, 68 L.Ed.2d 222 (1981); Borough of Glassboro v. Gloucester County Bd. of Chosen Freeholders, 100 N.J. at 147, 495 A.2d 49; Elizabeth v. Department of Envtl. Protection, 198 N.J. Super. 41, 50, 486 A.2d 356 (App.Div. 1984), modified and remanded on other grounds in A.A. Mastrangelo, Inc. v. Department of Envtl. Protection, 90 N.J. 666, 449 A.2d 516 *98 (1982). In so doing, the courts acknowledged the health, safety and welfare concerns implicit in regulation.
Moreover, the statute in no way discriminates against interstate commerce in waste. The statute merely regulates in-state facilities which handle waste. The regulation of interstate commerce is incidental to a larger, comprehensive scheme for the collection and disposal of New Jersey's waste. Certification of solid waste facilities is part of a comprehensive effort to deal with New Jersey's garbage crisis. Therefore, neither N.J.S.A. 48:13A-6(a) nor the Board's order is violative of the commerce clause.
Finally, the requirements for obtaining a certificate are not overly broad or burdensome. Contrary to Recycling & Salvage's assertions, there are adequate standards to guide the Board's determination when issuing a certificate. See N.J.A.C. 14:3-10.5.
[W]here discretionary power to grant or deny a license is reposed in an administrative official or body by a regulatory ordinance, adequate standards to guide the discretion must be found in or inferable from the ordinance or the provision is void. Weiner v. Borough of Stratford, supra (15 N.J. 295 [104 A.2d 659 (1954)]). The whole ordinance may be looked to in the light of its surroundings and objectives for the purpose of deciding whether there are standards and if they are sufficient. In re Berardi, 23 N.J. 485, 491 [129 A.2d 705] (1957). They need not be minutely detailed. Ward v. Scott, 11 N.J. 117 [93 A.2d 385] (1952). As Justice Jacobs there pointed out, "the exigencies of modern government have increasingly dictated the use of general rather than minutely detailed standards in regulatory enactments under the police power" (11 N.J. at page 123 [93 A.2d 385]), citing many examples from our statutes and reported cases. Much must necessarily depend on the nature of the determination involved and the official or body to whom the power is delegated. A standard will not be deemed inadequate simply because the discretion might be abused. Arbitrary action by the official will not be anticipated. [Moyant v. Borough of Paramus, 30 N.J. 528, 553, 154 A.2d 9 (1959)].
The Court in Moyant found a local ordinance, which provided for the regulation and licensing of solicitors and canvassers and embodied standards with respect to the applicant's background and character, constitutionally valid. See DeRoos v. Chapman, 106 N.J.L. 6, 147 A. 570 (Sup.Ct. 1929) (upholding an ordinance which required an applicant for a restaurant license to furnish *99 references as to his character and directed that no license shall be granted until the governing body shall be satisfied as to the applicant's fitness to conduct business).
Here, the certification requirement is a reasonable exercise of the police power. This regulatory measure is designed for the protection of the public against unqualified persons purporting to have the capacity, knowledge and qualifications necessary to engage in the solid waste industry. Certification, as here employed, may be taken as synonymous with licensure. N.J.S.A. 48:13A-6(a) specifically authorizes the Board to require a certificate. N.J.A.C. 14:3-10.5 sets forth the standard for obtaining a certificate. An applicant must disclose the names and addresses of all persons who have either financially or operationally a legal or beneficial interest in the applicant's business. The applicant must give appropriate information as to his skill, experience or education and as to his financial responsibility. The applicant must further provide a rate schedule and a certificate of registration from the DEP and such other information as the Board may deem necessary.
Clearly, there is nothing constitutionally defective in these requirements. It is not unreasonable for the Legislature to insist that the responsibility for waste disposal in this state shall be upon persons of good repute, character and responsibility. See generally Moyant v. Borough of Paramus, 30 N.J. 528, 154 A.2d 9 (1959); DeRoos v. Chapman, 106 N.J.L. 6, 147 A. 570 (Sup.Ct. 1929). There is nothing apparent in the Solid Waste Utility Control Act of 1970 which arbitrarily precludes a facility from processing out-of-state solid waste in New Jersey. If the applicant wishes to engage in the solid waste industry, that right is afforded him, subject to establishing competency and financial responsibility and obtaining an appropriate certificate evidencing his qualifications. The requirements for obtaining a certificate are neither overly broad nor burdensome, and the Legislature's action in requiring a certificate is lawful in its intended purpose to delimit the solid waste industry in the state to experienced and competent persons qualified to engage in such a business.

*100 IV.
Recycling & Salvage and Major also contend that the Board's order and the certification requirement of N.J.S.A. 48:13A-6(a) violate the contract clause because they impose unreasonable conditions in excess of what is necessary to protect public safety and because they substantially impair the contracts which Recycling & Salvage previously entered into. We disagree. The contract clause of the federal Constitution prohibits a state from passing any "law impairing the obligation of contracts...." U.S. Const., art. I, § 10, cl. 1. The New Jersey Constitution provides a similar, parallel prohibition. N.J. Const. of 1947 Art. IV, § 7, para. 3. These two constitutional provisions are construed and applied in the same way to provide the same protection. Fidelity Union Trust Co. v. New Jersey Highway Auth., 85 N.J. 277, 299-300, 426 A.2d 488 (1981), appeal dismissed, 454 U.S. 804, 102 S.Ct. 76, 70 L.Ed.2d 73 (1981); Edgewater Inv. Assocs. v. Borough of Edgewater, 201 N.J. Super. 267, 277, n. 4, 493 A.2d 11 (App.Div. 1985), aff'd, 103 N.J. 227, 510 A.2d 1178 (1986). Thus, it follows that if the order and regulatory scheme under attack are valid under the federal contract clause, then they are necessarily valid under the parallel State provision.
Although the language of the federal contract clause is absolute on its face, its prohibition against the impairment of contracts must be accommodated to the inherent police power of the states to safeguard the vital interests of their residents. Exxon Corp. v. Eagerton, 462 U.S. 176, 190, 103 S.Ct. 2296, 2305, 76 L.Ed.2d 497, 509-10 (1983); Energy Reserves Group, Inc. v. Kansas Power & Light Co., 459 U.S. 400, 410, 103 S.Ct. 697, 704, 74 L.Ed.2d 569, 580 (1983). The contract clause does not deprive the states of their power to adopt general regulatory measures even if those regulatory measures result in the impairment or destruction of private contracts. Exxon Corp. v. Eagerton, 462 U.S. at 190, 103 S.Ct. at 2305, 76 L.Ed.2d at 510. The United States Supreme Court has "long recognized that a *101 statute does not violate the Contract Clause simply because it has the effect of restricting, or even barring altogether, the performance of duties created by contracts prior to [the statute's] enactment." Id.
In determining whether a particular state regulatory measure is constitutionally valid under the contract clause, courts apply a three-pronged test. Energy Reserves Group, Inc. v. Kansas Power & Light Co., 459 U.S. at 410-13, 103 S.Ct. at 704-05, 74 L.Ed.2d at 580-81; Lower Main St. Assocs. v. New Jersey Hous. & Mortgage Fin. Agency, 219 N.J. Super. 263, 275-76, 530 A.2d 324 (App.Div. 1987), modified on other grounds, 114 N.J. 226, 553 A.2d 798 (1989); Edgewater Inv. Assocs. v. Borough of Edgewater, 201 N.J. Super. at 278, 493 A.2d 11. The first inquiry is whether the challenged regulatory measure has, in fact, caused a substantial impairment of a contractual relationship. In re Fiorillo Bros. of N.J., 242 N.J. Super. at 681, 577 A.2d 1316. If the challenged regulatory measure does impair a contract, then the second inquiry is whether the regulatory measure came into being pursuant to a significant and legitimate public purpose. Id. Once a legitimate public purpose has been established for the challenged regulatory measure, the inquiry shifts to whether the adjustment of the rights and responsibilities of the contracting parties caused by the regulatory measure is based upon reasonable conditions and whether the adjustment is sufficiently related to the appropriate governmental objective or interest. Id. at 681-82, 577 A.2d 1316. Applying this test to the order challenged here, it is clear that the order and certification requirement are valid under the contract clause.
Recycling & Salvage's contracts violated waste flow orders. See N.J.A.C. 7:26-6.1 et seq. The contracts issued in violation of such waste flow orders are void, and thus, Recycling & Salvage cannot show a substantial impairment of an existing legal contractual relationship. Indeed, N.J.S.A. 13:1E-29b, in pertinent part, provides:

*102 No new contract for solid waste collection or solid waste disposal, shall be entered into after the effective date of this act, unless such renewal or such new contracts shall conform with the applicable provisions of the approved solid waste management plan of the relevant solid waste management district or unless such contract is approved by the commissioner.
Moreover, even if Recycling & Salvage had proven a substantial impairment of an existing contract, it is evident that "a significant and legitimate" public purpose is served by the comprehensive regulation of the solid waste industry. The order and regulatory scheme under review are part of a comprehensive effort to deal with New Jersey's garbage crisis. It is uncontroverted that the safe and efficient disposal of the State's solid waste serves a "significant and legitimate" public purpose and the means chosen to implement that purpose are appropriate and reasonable. See In re Fiorillo Bros. of N.J., 242 N.J. Super. 667, 577 A.2d 1316 (1990).
Additionally, the certification requirement of N.J.S.A. 48:13A-6(a) is a reasonable condition that is sufficiently related to the appropriate governmental interest. "As is customary in reviewing economic and social regulation, ... courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure." Energy Reserves Group, Inc. v. Kansas Power & Light Co., 459 U.S. at 412-13, 103 S.Ct. at 704-05, 74 L.Ed.2d at 581 (quoting United States Trust Co. v. New Jersey, 431 U.S. 1, 22-23, 97 S.Ct. 1505, 1517-1518, 52 L.Ed.2d 92, 110 (1977)). The Legislature empowered the Board to issue certificates to any person found to be qualified by experience, training or education and found to be financially responsible. This regulation effectively protects the public against unscrupulous persons purporting to have the qualifications necessary to engage in the solid waste industry.
It is in this context that the certification requirement must be viewed. To the extent, if any, that N.J.S.A. 48:13A-6(a) or the Board's order impairs Recycling & Salvage's contractual interests, the statute and order are prompted by significant and legitimate state interests. The state exercised its police power *103 to protect the public from unscrupulous and unqualified persons. There can be little doubt about the legitimate public purpose behind the certification requirement. Finally, the means chosen to implement these purposes are not unreasonable, particularly in light of the deference to which the Legislature's judgment is entitled.

V.
Recycling & Salvage contends that the Board's order effects a taking of its property for which it must be compensated because the order prevented Recycling & Salvage from performing its contractual obligations thus destroying said contracts. Again we disagree. The fifth amendment to the United States Constitution prohibits the taking of private property "for public use without just compensation." U.S. Const. amend. V. The New Jersey Constitution contains a similar, parallel prohibition. N.J. Const. of 1947 art. I, para. 20. Thus, it follows that if the regulatory scheme and order under attack are valid under the federal taking clause, then they are necessarily valid under the parallel state provision.
There is a distinction between a taking in the constitutional sense for government use, for which compensation is compelled, and restrictions imposed on the use of property through governmental exercise of the police power, for which no compensation is mandated.
Many years ago, Professor Freund stated in his work on The Police Power, sec. 511, at 546-547, `It may be said that the state takes property by eminent domain because it is useful to the public, and under the police power because it is harmful * * *. From this results the difference between the power of eminent domain and the police power, that the former recognizes [sic] a right to compensation, while the latter on principle does not.' Thus the necessity for monetary compensation for loss suffered to an owner by police power restriction arises when restrictions are placed on property in order to create a public benefit rather than to prevent a public harm. [New Jersey Builders Ass'n v. Department of Envtl. Protection, 169 N.J. Super. 76, 97, 404 A.2d 320, certif. denied, 81 N.J. 402, 408 A.2d 796 (1979) (quoting 1 Rathkopf, The Law of Zoning and Planning 6-7 (4th ed. 1978)].
Thus, the government need not normally compensate property owners for restrictions placed on property use pursuant to the *104 police power (i.e., for the health, safety or welfare of the public). However, if the regulation unjustly reduces the economic value of property (e.g. only slightly promotes public welfare, but greatly reduces property value) the regulation may be deemed a taking for which compensation is due.
Here, the Board's order and the certification requirement are not a taking because both the order and certification requirement are a proper exercise of the state's police power. "The police power is the public right to reasonable regulation for the common good and welfare." Katobimar Realty Co. v. Webster, 20 N.J. 114, 123, 118 A.2d 824 (1955). The state's power to protect the public health, safety and welfare may be validly exercised under the contract clause even if it impairs a contractual obligation. Home Bldg. & Loan Ass'n v. Blaisdell, 290 U.S. 398, 428-29, 54 S.Ct. 231, 236-37, 78 L.Ed. 413, 423 (1934); P.T. & L. Constr. Co. v. Commissioner, Dep't of Transp., 60 N.J. 308, 314, 288 A.2d 574 (1972). However, "[t]he constitutional interdiction against impairment of contracts is not an absolute one. It is subject to the implied condition that a contract's fulfillment may be frustrated by the appropriate exercise, as here, of the police power." Stamboulos v. McKee, 134 N.J. Super. 567, 575, 342 A.2d 529 (App.Div. 1975) (citing Brookchester, Inc. v. Ligham, 17 N.J. 460, 111 A.2d 737 (1955); Albigese v. Jersey City, 127 N.J. Super. 101, 316 A.2d 483 (Law Div.), modified on other grounds, 129 N.J. Super. 567, 324 A.2d 577 (App.Div. 1974), and cases cited therein); American Trial Lawyers Ass'n v. New Jersey Sup. Ct., 126 N.J. Super. 577, 316 A.2d 19 (App.Div.), aff'd, 66 N.J. 258, 330 A.2d 350 (1974)).
It is clear that an owner's use of property may be diminished by governmental order. Furthermore, the governmental act does not in every instance require payment.
Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law. As long recognized, some values are enjoyed under an implied limitation and must yield to the police power. [Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 413, 43 S.Ct. 158, 159, 67 L.Ed. 322, 325 (1922)].
*105 The uncontrolled use of land, if unchecked, is harmful to the public interest, and therefore, the government may within the scope of its police power regulate that use.
Since L. 1970, c. 40, § 7 the certification requirement has been a part of every solid waste collection and disposal scheme. This was known, or should have been known, to Recycling & Salvage. Recycling & Salvage could choose to engage in or not to engage in the solid waste industry in New Jersey. Once Recycling & Salvage chose to operate in New Jersey, it subjected itself to the Solid Waste Utility Control Act and the Board's jurisdiction. There was no unconstitutional interference with Recycling & Salvage's contracts. Moreover, because Recycling & Salvage operated without certification and in violation of waste flow orders, its contracts are void. Therefore, there is no taking of Recycling & Salvage's property rights.

VI.
We turn to Recycling Center, Recycling & Salvage, Scugoza, and Major's ex post facto challenge and Recycling Center, Recycling & Salvage, Scugoza, Major and Yonclas' evidentiary challenge to the assessment of penalties. We are satisfied from our study of the record that the Board properly assessed penalties. During the pendency of these proceedings, the Legislature amended N.J.S.A. 48:13A-12(b) effective June 29, 1989, to increase the amount of penalties and to permit their assessment on a daily basis. Using that penalty basis only for violations occurring after the amendment's effective date, the Board calculated on a daily basis a fine for continued operation of the unlicensed facility and waste flow violations from June 29, 1989 until December 1, 1989. The fact that the Legislature enhanced those penalties during the pendency of this proceeding does not render the penalty imposed illegal or unconstitutional because the penalty is civil. Moreover, the Board only assessed penalties based on the 1989 amendment for the time period following the amendment's effective date through December 1, 1989 when appellants ceased operation.
*106 The United States Constitution prohibits a state from "pass[ing] any ... ex post facto law." U.S. Const. art. I, § 10. The New Jersey Constitution contains a similar, parallel prohibition. N.J. Const. of 1947 art. 4, § 7, para. 3. This prohibition limits the power of the state only with regard to the imposition of criminal punishment. United States v. Halper, 490 U.S. 435, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989). The ex post facto clause is not applicable to legislation imposing civil disabilities. Harisiades v. Shaughnessy, 342 U.S. 580, 594, 72 S.Ct. 512, 521, 96 L.Ed. 586, reh'g denied, 343 U.S. 936, 72 S.Ct. 767, 96 L.Ed. 1344 (1952). Whether a particular statutorily defined penalty is civil or criminal is a matter of statutory construction.
New Jersey does not define "ex post facto law" any more expansively than does federal law. See Lindsley v. State Prison Bd. Managers, 107 N.J.L. 51 [151 A. 294] (Sup.Ct. 1930), aff'd 108 N.J.L. 415 [158 A. 342] (E. & A. 1931); State v. Donato, 106 N.J.L. 397 [148 A. 776] (E. & A. 1929). Similarly, in New Jersey, as under federal law, the prohibition against ex post facto laws applies only to laws of a penal and criminal nature, State, Bonney v. Collector of Bridgewater, 31 N.J.L. 133 (Sup.Ct. 1864), and administrative or judicial proceedings to collect penalties have been recognized as noncriminal  this is, civil  in nature. Sawran v. Lennon, 19 N.J. 606, 612 [118 A.2d 10] (1955); Conservation and Ec. Dept. v. Scipio, 88 N.J. Super. 315, 320 [212 A.2d 184] (App.Div. 1965), certif. den. 45 N.J. 598 [214 A.2d 32] (1965). [In re Kaplan, 178 N.J. Super. 487, 495, 429 A.2d 590 (App.Div. 1981)].
In Kennedy v. Mendoza-Martinez, 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963), the United States Supreme Court enumerated some elements that are helpful in determining whether a penalty is civil or criminal.
Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of scienter, whether its operation will promote the traditional aims of punishment  retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned are all relevant to the inquiry, and may often point in differing directions. [Id. at 168, 83 S.Ct. at 567, 9 L.Ed.2d at 661].
Applying these factors to this case, it is clear that the sanctions imposed on Recycling Center, Recycling & Salvage, Scugoza and Major are civil penalties. N.J.S.A. 48:13A-12(b) of the Solid Waste Utility Control Act of 1970, as amended, provides:

*107 Any person who shall violate any provision of this act or any rule, regulation or administrative order adopted or issued hereunder, including an interdistrict waste flow order issued in conjunction with the Department of Environmental Protection, or under any applicable provision of Title 48 of the Revised Statutes, or who shall engage in the solid waste collection business or solid waste disposal business without having been issued a certificate of public convenience and necessity, shall be liable to a penalty of not more than $10,000.00 for a first offense, not more than $25,000.00 for a second offense and not more than $50,000.00 for a third and every subsequent offense. Each day during which the violation continues constitutes an additional, separate and distinct offense. The penalties herein provided shall be enforced by summary proceedings instituted by the board under "the penalty enforcement law" (N.J.S.A. 2A:58-1 et seq.). The Superior Court and the municipal courts shall all have jurisdiction to enforce "the penalty enforcement law" in connection with this act.
The penalties provided for in N.J.S.A. 48:13A-12(b) do not constitute criminal punishment under the criteria set forth in Kennedy v. Mendoza-Martinez, 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644. For example, the monetary penalties of N.J.S.A. 48:13A-12(b) are not excessive in relation to the funds expended by the state for the investigation and prosecution of violators of the Solid Waste Utility Control Act. In Helvering v. Mitchell, 303 U.S. 391, 58 S.Ct. 630, 82 L.Ed. 917 (1938), the Supreme Court considered a challenge to a revenue statute imposing a 50% addition to tax on a deficiency, if any part of the deficiency was found to be due to fraud with an intent to evade tax. The Supreme Court reasoned that the sanction was "provided primarily as a safeguard for the protection of the revenue and to reimburse the government for the heavy expense of investigation and the loss resulting from the taxpayer's fraud," in holding that the sanction was "remedial", not criminal. Id. at 401, 58 S.Ct. at 634, 82 L.Ed. at 923. Congress' intent to impose a civil sanction was clear  a "distinctly civil procedure" was provided for the collection of the additional 50% tax. Id. at 402, 58 S.Ct. at 634, 82 L.Ed.2d at 923. Similarly, N.J.S.A. 48:13A-12(b) provides "a distinctly civil procedure" for the collection of the sanction. See N.J.S.A. 2A:58-1, et seq.; R. 4:70.
Like the United States Supreme Court, the New Jersey Supreme Court has found monetary penalties to be civil. In In *108 re Garay, 89 N.J. 104, 444 A.2d 1107 (1982), defendant argued that the monetary penalties for Medicaid fraud were penal in nature. Our Supreme Court, in finding the penalty remedial, reasoned
While it is true that Medicaid fraud is also a crime and that the penalty provisions of N.J.S.A. 30:4D-17 apply only to one who has wilfully defrauded the government, application of the other factors suggests that these sanctions are civil. Monetary penalties such as these have been established in a variety of statutes. They have a clear non-punitive purpose and they have consistently been considered civil by the courts. See Rex Trailer Co. v. United States, 350 U.S. 148, 76 S.Ct. 219, 100 L.Ed. 149 (1956) (penalty of $2,000 for each violation of § 26(b) of the Surplus Property Act of 1944); United States ex rel. Marcus v. Hess, 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1943) (penalty of $2,000 per violation plus double the amount of damages for false claims to the Public Works Administration); Helvering v. Mitchell, 303 U.S. 391, 58 S.Ct. 630, 82 L.Ed. 917 (1938) (penalty for income tax fraud of 50% of the amount of the fraud, in addition to repayment of that amount); Toepleman v. United States, 263 F.2d 697 (4th Cir.1959), cert. den. sub nom. Cato v. United States, 359 U.S. 989, 79 S.Ct. 1119, 3 L.Ed.2d 978 (1959) (penalty of $2,000 per claim under the False Claims Act).
The obvious purpose of the penalty provisions here, and in the cases cited above, is to recover the costs of fraud investigations and of the legal proceedings required to ensure repayment. These penalties are in effect liquidated damages for the State's costs. In this case, those costs include the investigative staff necessary to uncover respondent's wrongdoing, preparation of these administrative proceedings and appeals that have reached this Court. More generally, the State may properly seek to recover from those who have defrauded it the costs of the overall investigative effort necessitated by the persistence of Medicaid fraud. [Id. at 113-14, 444 A.2d 1107].
Thus, appellants' ex post facto argument must fail.
Finally, all appellants, Recycling & Salvage, Recycling Center, Scugoza, Major and Yonclas violated the certification requirement for solid waste utilities and the waste flow orders. The Board assessed penalties totalling $771,000 jointly and severally against all appellants. The Board found that the penalty provisions of N.J.S.A. 48:13A-12(b) allowed it to assess a one-time fine of $1,000 for all violations occurring up to and until June 29, 1989, and thereafter, based on the 1989 amendment (L. 1989, c. 118, § 1), a $5,000 fine per day for each day that they found the violation to exist, which was until December 1, 1989. Scugoza and Yonclas ran the joint operation on Frelinghuysen Avenue, and Major, as President of Recycling & *109 Salvage, made no efforts to halt the unlawful solid waste utility operations by that entity. Given the integrated nature of the operation, the Board properly held the individual appellants jointly and severally liable for the penalties assessed. Therefore, the Board's assessment of penalties in the total sum of $771,000 against all appellants jointly and severally was proper.
Accordingly, we affirm the final administrative action of the Board substantially for the reasons expressed in the Board's thorough written decision and order of February 9, 1990.