**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1582-22

IN THE MATTER OF THE
PETITION OF NEW JERSEY
NATURAL GAS COMPANY
FOR A DETERMINATION
CONCERNING THE HOLMDEL
REGULATOR STATION
PURSUANT TO N.J.S.A.
40:55D-19 -2017 PETITION.

_____

IN THE MATTER OF THE
PETITION OF NEW JERSEY
NATURAL GAS COMPANY
FOR A DETERMINATION
CONCERNING THE HOLMDEL
REGULATOR STATION
PURSUANT TO N.J.S.A.
40:55D-19 -2018 PETITION.

_____

Argued November 19, 2024 – Decided April 17, 2025

Before Judges Susswein, Perez Friscia and Bergman.

On appeal from the New Jersey Board of Public Utilities, Docket Nos. GO17010023 and GO18111257.

Peter D. Dickson argued the cause for appellant Township of Holmdel.

Matko Ilic, Deputy Attorney General, argued the cause for respondent New Jersey Board of Public Utilities (Matthew J. Platkin, Attorney General, attorney; Sookie Bae-Park, Assistant Attorney General, of counsel; Matko Ilic, on the brief).

Mamie W. Purnell, Assistant Deputy Rate Counsel, argued the cause for respondent New Jersey Division of Rate Counsel (Brian O. Lipman, Director, attorney; Mamie W. Purnell, on the brief).

James C. Meyer argued the cause for respondent New Jersey Natural Gas Company (Riker Danzig LLP, attorneys; James C. Meyer and Michael S. Kettler, on the briefs).

PER CURIAM

This appeal arises from a protracted dispute concerning the construction of an aboveground natural gas pressure reduction facility, also known as a regulator station, and its associated heating equipment. Holmdel Township (the Township) appeals from the Board of Public Utilities' (the BPU) December 21, 2022 final decision granting the New Jersey Natural Gas Company's (NJNG) petition to construct the facility (the Project). An Administrative Law Judge (ALJ) heard the matter over the course of six days. After considering extensive expert testimony and making credibility findings, the ALJ found the proposed Project was "reasonably necessary for the service, convenience or welfare of the public" and posed no adverse public health concerns.

The BPU adopted the ALJ's initial decision without modification, concluding that the Municipal Land Use Law (MLUL), N.J.S.A. 40:55D-1 to -163, and Holmdel Township's local ordinances did not preclude the Project. In doing so, the BPU exercised its authority pursuant to N.J.S.A. 40:55D-19 to override the Township's denial of the Project.

On appeal, the Township argues the BPU: failed to consider the entire record and erroneously relied on NJNG's pre-filed direct testimony while ignoring contradictory information adduced on cross-examination; failed to apply climate laws; wrongly considered the proposed regulator station as a reliability project, instead of a costly future stranded asset; erroneously disregarded NJNG's alleged failure to consider alternatives and that NJNG's current underground regulator station is still viable and has a remaining useful life of at least fifteen to twenty years; and ignored the Holmdel Township Zoning Board of Adjustment's (Zoning Board) decisions yet accepted allegedly self-contradictory testimony of NJNG's experts.

After carefully reviewing the extensive record in light of the parties' arguments and governing legal principles, we affirm. We are satisfied there is sufficient evidence in the record to support the BPU's decision and we decline to substitute our judgment for the BPU's on the critical question of whether the

A-1582-22

Project is reasonably necessary for the service, convenience or welfare of the public pursuant to N.J.S.A. 40:55D-19. The Township failed to demonstrate that there was no evidence before the Board to support its decision. See N.J.S.A. 48:2-46 (authorizing the Appellate Division to set aside any BPU order "in whole or in part when it clearly appears that there was no evidence before the [B]oard to support the same reasonably").

I.

We discern the following procedural history from the record. On March 17, 2015, NJNG filed an application with the Zoning Board requesting variances and approvals to construct an aboveground regulator station at 970 Holmdel Road. The Zoning Board denied the application on December 7, 2016.

On January 11, 2017, NJNG filed a petition with the BPU, seeking to override the Zoning Board's decision pursuant to N.J.S.A. 40:55D-19 through a determination that the proposed Project is "reasonably necessary for the service, convenience, or welfare of the public, and that the zoning and land-use ordinance of the municipality and its county shall have no application thereto." It also cited to N.J.S.A. 48:2-23, which allows the BPU to require a public utility "to furnish safe, adequate and proper service . . . and to maintain its property and equipment in such condition as to enable it to do so."

On January 23, 2017, the BPU referred NJNG's petition to the Office of Administrative Law (OAL) as a contested case. The matter was assigned to ALJ Elia A. Pelios. On April 3, the Township filed an unopposed motion to intervene, which the ALJ granted.

On January 2, 2018, NJNG filed a new application with the Zoning Board, seeking use variances, a conditional use approval, and site plan approval for the construction of the regulator station at a different location on Holmdel Road. The Zoning Board denied NJNG's application on October 25.

On November 29, 2018, NJNG filed a new petition with the BPU pursuant to N.J.S.A. 40:55D-19 and N.J.S.A. 48:2-23, again seeking to override the Zoning Board's denial of its regulator station application at the new proposed location at 960 Holmdel Road. NJNG also requested its new petition be consolidated with its prior petition, which had been put on inactive status.

On December 3, 2018, the BPU transmitted NJNG's second petition to the OAL as a contested case. ALJ Pelios consolidated the two petitions and granted the Township's motion to intervene.

On February 13, 2020, ALJ Pelios presided over a public hearing and then convened six virtual evidentiary hearings in October 2020.

A-1582-22

On March 2, 2020, the Township filed a motion to direct NJNG to "undertake a formal review of the merits of this [P]roject measured against the new policies" of New Jersey's 2019 Energy Master Plan[1] (EMP). The ALJ denied the motion on June 11, 2020, concluding NJNG "should not be required to reassess their petition[s] in light of the general goals of the EMP." The ALJ thereafter denied the Township's motion for reconsideration.

## II.

We next recount the pertinent facts adduced at the evidentiary hearings. We describe the evidence presented by both NJNG and the Township in considerable detail to show the breadth, scope, and specificity of competing expert opinion testimony that the ALJ considered.

In 2012, with the BPU's approval, NJNG installed a new sixteen-inch diameter underground natural gas transmission line through Holmdel. This transmission line served NJNG's customers in Monmouth County, including approximately 6,100 metered customers in Holmdel and additional customers in the surrounding communities. NJNG intended for this sixteen-inch line to replace eight miles of an existing line of ten-inch pipe to comply with federal

---

[1] N.J. Dep't of Env't Prot., 2019 New Jersey Energy Master Plan: Pathway to 2050 (2020).

safety regulations, which include a new requirement that transmission lines be capable of being checked by an inline inspection device often referred to as "smart pig" technology.

Because NJNG kept the remaining ten-inch line as part of its distribution system, it needed to manage the depressurization of natural gas from transmission pressures in the sixteen-inch line, which exceed 700 pounds per square inch gauge (psig), to approximately 125 psig or lower in the ten-inch line. At the connection point of the two pipelines, NJNG installed what it considered to be a "temporary" regulator station in a vault casement under Holmdel Road, intending to find a more permanent aboveground location.

NJNG sought to locate an available aboveground site that would: (1) be operationally suitable to meet the reliability need by being located close to the transmission line at its southern end; (2) minimize impacts on Holmdel residents by avoiding residential zones and seeking already-developed property; and (3) minimize impacts on the environment by avoiding preserved farmland, Green Acres sites, wetlands, and sites requiring more than minimal tree clearing.

NJNG first considered the property at 970 Holmdel Road. As we have noted, the Zoning Board denied the application for the required variances and

A-1582-22

approvals at that proposed site. Further, the property owner at 970 Holmdel Road refused to grant NJNG an easement for the Project.

NJNG then considered the property at 960 Holmdel Road. That property comprises 16.51 acres and is located in a zone that allowed public utility infrastructure as a conditional use. The property already contained an 80,000 square-foot office complex with two office buildings and associated front and rear parking lots. It also contained a cellular communications tower that stood over 100 feet tall. A solar farm was located just south of the site.

NJNG obtained an easement area from the property owner comprising approximately 6,000 square feet (40 feet by 150 feet) on the southeastern side of the property. NJNG also obtained an additional easement for access off of the existing office building's driveway.

A.

We next recount the expert testimony heard by the ALJ, starting with the experts presented by NJNG: Kraig Sanders, Marc Panaccione, John Wyckoff, Jeffrey Otteau, Edward Potenta, Robert Chilton, and Christine Nazzaro Cofone.

Sanders, Panaccione, and Wyckoff testified collectively as a panel (the panel) as to the need for NJNG's proposed regulator station. Sanders was NJNG's Director of Pressure Management and Transmission, responsible for the

8

maintenance and operation of NJNG's metering and regulator stations, transmission facilities, and for NJNG's gas control center, which remotely handles the operations and control system for the entire delivery system. Panaccione was NJNG's senior engineer, responsible for the engineering design, project management, construction oversight, and system planning for its transmission and distribution systems. Wyckoff was NJNG's vice president, responsible for overseeing all aspects of NJNG's natural gas infrastructure. NJNG employed Sanders for nineteen years, Panaccione for over fourteen years, and Wyckoff for thirty years.

The panel testified that installing the proposed regulator station required installation of a Cold Weather Technologies (CWT) heater, which significantly reduces the pressure of transported natural gas between the transmission and distribution systems in a safe, adequate, and reliable manner to deliver natural gas to NJNG customers in Holmdel and nearby areas. They explained that freezing and icing problems occur from depressurization of natural gas "primarily due to ambient moisture," i.e., water vapor in the natural gas. The difference in pressures between a transmission line and a distribution line "can cause a temperature drop of the gas of up to [forty] degrees, to temperatures below freezing; this causes ice encasements around regulators, control

9

equipment and piping due to the freezing of moisture in the surrounding air and ground as well as in the pipeline." That, in turn, can cause damage to the equipment and result in loss of gas service to the NJNG customers serviced by that regulator.

The underground regulator station installed under Holmdel Road, however, could not include a CWT heater unit to prevent icing due to the station's lack of venting and air flow required to power it. To mitigate the risks of an outage from reducing the temperature drop and the intensity of freezing, NJNG operated this portion of its system at sub-optimal inlet gas pressures, i.e., a maximum of about 450 psig in winter and 400 psig or below in summer. Despite these precautionary measures, the underground regulator station was continuously encased in ice throughout the winter.

NJNG introduced a photograph from February 2018 showing the underground regulator encased in thick ice. Two icing incidents were also severe enough to cause the regulator station to malfunction and be taken out of service for repairs because it could not maintain pressure. NJNG explained that:

> [L]owering the maximum operating pressure of the Holmdel transmission line . . . simply to avoid having to install a heater . . . would be operationally imprudent because it would significantly inhibit NJNG's ability to provide adequate and reliable service . . . during peak

10

winter months, when uninterrupted gas service is most critical.

The panel testified that the current underground regulator station was installed only as a "stopgap measure," and that "it was never intended as a permanent solution." They acknowledged, however, that the current regulator station, from "a mechanical device standpoint," with proper maintenance could have a useful life of "[fifteen], [twenty] years [or] . . . longer as well." On cross-examination, the Township's counsel referred to an exhibit on depreciation schedules which showed the regulator had twenty-two more years of useful life. Wyckoff responded that the schedule pertained to its useful life "in financial terms" and not "in physical terms." Sanders opined that the risk linked to the temporary regulator station was "the potential for failure."

Wyckoff also acknowledged that the immediate area was predicted to grow "around less than [one] percent for the next few years." Nonetheless, he testified that NJNG made no change to its anticipated load projections.

NJNG considered various sites to locate the proposed regulator station. Panaccione first explained that NJNG used several criteria to narrow the search. Specifically, they were looking for properties: (1) that were adjacent to the current transmission line and close to its southern end, so the proposed regulator station would be near the line that feeds Holmdel and the surrounding areas yet

11

provide adequate spacing from other stations to minimize system vulnerability; (2) that were zoned for commercial or utility uses, and large enough to accommodate the proposed facility with landscaping; (3) that were not Farmland Preserved, Green Acres, wetlands, contaminated property, or properties that would require extensive deforestation or be too close to residential zones; and (4) that contained preexisting development.

Using those criteria and parameters, NJNG identified six potential sites. Two sites were not chosen because they were near the northern portion of the transmission line, zoned for residential use, and the property owner was unwilling to grant NJNG an easement. Monmouth County owned the third site, but it was unsuitable because the site was close to the northern end of the line and was purchased using Green Acres' funding. The fourth site was on the southern end of the line, but the owner was unwilling to grant NJNG an easement. The final two properties were located at 970 and 960 Holmdel Road. NJNG originally considered 970 Holmdel Road, which contained another utility facility, a solar farm, and was available by the owner, but the Zoning Board objected because the proposed regulator station would need to be located too close to Holmdel Road. NJNG's ultimately selected site, 960 Holmdel Road, already contained another utility facility, a cell tower, and a commercial

12

building, but the proposed regulator station could be constructed further back and the property could accommodate additional landscaping.

In addition to location, NJNG also considered various alternative heaters for the proposed regulator station. NJNG's panel said they were "not aware of any electric heating technology currently available in the industry that would meet the required needs in this type of application." They also stated that NJNG considered using a catalytic heater, which uses radiant heat, but it had not installed such heaters since 2010 after finding "numerous issues with their reliability[,]" especially "extensive problems with the catalytic heaters' heater panels and circuit boards, as well as electrical issues." In the five catalytic inline heaters installed between 2008 and 2010, NJNG experienced major failures to six heater panels within the first two years of operation, and had to replace thirty-two panels in four years. There also were "several electrical failures related to wiring, thermocouples and connectors."

Furthermore, NJNG considered using indirect-fixed water bath heaters to pre-heat the natural gas prior to regulator station pressure reduction instead of the proposed CWT heater. However, the CWT heater is preferable because it would have a near silent operation, lower vent heights, a simpler modular

design, reduced maintenance requirements, lower required gas fuel operational pressure, significantly improved thermal efficiency, and reduced emissions.

Otteau, a real estate valuation expert, opined on the proposed Project's impact on property values. He used a "paired sales technique" to analyze "sales or rental data on nearly identical properties . . . to isolate a single characteristic's effect on value or rent," such as the construction of a regulator station, and determine the Project's impact on nearby property values. Based on his market study, Otteau concluded that five other stations had not caused any stigma[2] to affect the surrounding neighborhood properties or diminution in the market appeal or property value for nearby properties. He thus concluded that the Project would not have any adverse impact on nearby property values.

Otteau also rejected the "repeat sales technique" used by appellant's witnesses to examine sales of the same property before and after a particular event, such as the installation of a regulator station. He explained that there are

---

[2] Otteau relied on "The Dictionary of Real Estate Appraisal (6th Edition)" to define "stigma" as: "[a]n adverse public perception regarding a property, commonly the identification of a property with a condition such as environmental contamination or other detrimental condition, such as a violent crime, that penalizes the marketability of the property and may also result in a diminution in value." He represented that "[t]his definition indicates that there must be a quantifiable penalty to the market appeal of a property for stigma to exist."

often many reasons for changes in property values over time, such as market and economic changes, financial crises, and pandemics. Adjustments for changes in property values over time can become even more complex over extended time periods, making the repeat sales technique more problematic, subjective, and less reliable than an examination of matched pairs.

Potenta offered expert testimony on the air quality, noise, and related environmental impacts of the proposed regulator station. His background includes degrees in civil and environmental engineering and over forty years of multi-disciplinary experience in the field of environmental engineering, specifically air quality and noise impact analyses and prediction modeling. In addition, he is a certified environmental consultant and member of the Institute of Noise Control Engineering and the Environmental Assessment Association.

Based on his noise assessment tests, Potenta concluded that NJNG's proposed regulator station will comply with applicable state and local noise regulations. He also found that the noise generated will be lower than the existing daytime and nighttime ambient noise levels so as not to be noticeable to the surrounding residences or have an adverse impact on the surrounding community.

With regard to the emissions from NJNG's proposed CWT heater, Potenta prepared an air-quality assessment using the New Jersey Department of Environmental Protection's (DEP) air quality risk screening method and the United States Environmental Protection Agency's regulatory air prediction model to evaluate the air quality impact to the surrounding areas. Potenta concluded that neither the regulator station nor its heater will have any adverse impact on local or state air quality. He explained that the majority of the heater's emissions would be carbon dioxide and water vapor, which are not toxic pollutants. However, in the "worst-case scenario[,]" namely, a situation when the CWT heater does not reach "proper combustion temperatures[,]" Potenta admitted that the heater may emit trace amounts of air pollutants. Nevertheless, his results showed that the predicted concentrations would be considered "negligible," which he defined as "significantly below the criteria air pollutant standards" set by state and federal agencies.

Chilton testified as an expert in New Jersey energy utility regulation and policy, including development, interpretation, and implementation of New Jersey's EMP. While working for the BPU as the Division of Energy's Director, Chilton was responsible for the development of energy policy and related rulemaking, and worked on the development of several prior EMPs and their

16

updates, specifically the 1991 and 1995 EMPs which restructured the retail electrical and natural gas markets. He also oversaw numerous siting matters and supervised engineers reviewing gas utility applications concerning the reliability of their gas distribution systems.

According to Chilton, New Jersey's EMP is a "policy" and "long-range planning document that sets a vision, strategies and goals to achieve by 2050 a transition to a [one hundred percent] carbon-neutral electric grid, and a[n] [eighty percent] reduction in the State's carbon emissions, including a [seventy-five percent] reduction in natural gas consumption." He explained that there are "many important implementation details still to be worked out in future proceedings." He considered NJNG's proposed regulator station in light of the current 2019 EMP, concluding the Project is consistent with the EMP's Goal 5.4, which aims to maintain existing gas pipeline system reliability and safety while planning for future reductions in natural gas consumption.

Chilton further determined that the proposed regulator station does not constitute an "expansion" of the natural gas system as described in the EMP because it satisfies Goal 5.4. He added that the proposed Project will be "used and necessary" over the course of its "typical useful life"—which the panel

17

A-1582-22

stated was at least twenty or twenty-five years—and so it would be unlikely to become a stranded asset under the EMP.

Cofone, a certified and licensed professional planner, testified as an expert in planning and land use. She opined that NJNG duly considered Holmdel's zoning ordinances and its community zone plan when it proposed the new regulator station. She further explained that the proposed site is zoned for conditionally permitted public utility use, and after visiting the site, she found that it is already developed as a commercial property "with an 80,000 square foot multi-tenanted office building with related parking and a cell tower that is over 100 feet tall and easily visible to the public . . . and [a] solar farm on the adjacent property also is visible to the public." Thus, Cofone concluded that the proposed regulator station will not change the character of the area.

Cofone also opined that NJNG's Project, which she characterized as "a benign facility," "will not have any negative impact on the surrounding neighborhood" and is "consistent with Holmdel's master plan, which calls for adequate infrastructure to serve the township while also conserving its natural resources." She explained that "there will be no traffic, permanent on-site employees, or population increase and [Potenta]'s offered expert testimony is that it will have no noise impacts, and the Regulator Station will be less visible

18

than the cell tower because of the extensive screening, landscaping and berm." She pointed out that the regulator station qualified as "an incredibly passive use[,]" which was "similar" to the existing "taller, far more visible, far less green" cell tower that the Zoning Board had previously approved, and therefore should be permitted. Thus, she found the Project was consistent with the master plan's goals, which include maintaining "the unique character of Holmdel," protecting "the Township's open spaces from development," and providing "adequate infrastructure to serve Township residences and businesses" while "limit[ing] the development of growth-inducing infrastructure."

Cofone further opined that moving the proposed regulator station further back on the proposed site, as the Township suggested, would not achieve any planning benefits, and would not lessen any negative impacts as "it was well-screened and not visible from where it was proposed and not violative of any conditional use standards for the siting of that actual structure." She pointed out that the variance NJNG sought from the Zoning Board was "not for the location of the proposed regulator station on the property, it was for the introduction of the third beneficial use on the property, so the location was not violative of the Holmdel ordinance."

B.

The Township presented testimony from Prakash Santhana, Dr. Donald Moliver, and Berne L. Mosley.

Santhana, an elected Holmdel Township committee member, also appeared at the ALJ's public hearing. His testimony offered on behalf of the other committee members, expressed the public's concerns about the Project's potential impacts on the environment, natural gas rates, and general quality of life in Holmdel. He also testified that "safe, efficient and reliable service" had already been provided to Holmdel's residents for the past twenty years, so there was no need for NJNG's proposed regulator station. Regarding the sixteen-inch pipeline and the potential for greater pressures, he stated that: "[t]he need for an increase in pressure . . . to 722 psig has nothing to do with Holmdel or area residents' consumption as indicated by the lack of population growth in all of Monmouth County over the last [twenty] years."

Moliver, who has a Ph.D. in economics and is a certified tax assessor and general real estate appraiser, testified on the lower sales prices that would be ascribed to the proximity of the aboveground regulator station. He stated that the regulator station would create safety and environmental risks, such as noxious odors emissions and noise pollution. These risks, in turn, "would create

20

an environmental stigma in the nearby community and lead to an unspecified diminution of real estate property values . . . [that] would last an indeterminate period of time until . . . the use is abandoned, sufficiently modified, relocated, or the public's reaction to its presence no longer is adverse." He also disagreed with Otteau and opined that a "repeat sales" methodology comparing the sales value of the same residences before and after the construction of a nearby regulator station was a "better example" of whether the regulator station would adversely impact property values since "[a]ny differences in sales price . . . could be ascribed to the proximity of the Facility."

On cross-examination, Moliver admitted that he used a drone to examine the area and had not reviewed any of the other potential sites that NJNG had previously considered. He also explained that public perception of a condition can impact property values.

Mosley, who testified as an expert and private consultant in pipeline flow and hydraulic analysis, previously worked at the Federal Energy Regulatory Commission (FERC) for approximately twenty-eight years, where he was mainly responsible for supervising and processing permit applications for interstate natural gas pipelines. While at the FERC, Mosley gained expertise in performing hydraulic analyses of natural gas flow through pipelines, meters, and

21

regulators, and was knowledgeable about the engineering requirements of maintaining adequate and appropriate pipeline capacity, operating pressures and temperatures. He also had experience with noise and air issues attributed to regulator stations but did not consider himself an expert on those issues.

The Township's counsel asked Mosely to testify about whether the proposed regulator station: (1) is necessary; (2) is appropriately sized and scaled; (3) is redundant due to the current underground regulator station; (4) can be moved farther away from the road and the other current properties on the site; (5) can use a catalytic heater; and (6) implicates New Jersey's 2019 EMP and the Governor's related executive orders, specifically, Executive Order No. 100 (Jan. 27, 2020), 52 N.J.R. 365(a) (Mar. 2, 2020) (EO100).

Mosley opined that the BPU should deny NJNG's petition or, in the alternative, hold its decision in abeyance. He explained that "because of the accelerated schedule[,]" the record was "woefully inadequate for determining the need, size, heating source and potential alternative location(s) for the proposed regulator." For example, notwithstanding Sanders's testimony, Mosley explained that there was no information "on the frequency and duration of these icing events, in that such information would prove to be a good indicator of any reasonably expected operational issues associated with the continued use

of the temporary regulator as currently configured."  Also, if the icing incidents were as frequent and severe as Sanders testified, "surely the [BPU] must be interested in knowing what measures NJNG has undertaken to mitigate such incidents, as well [as] knowing what contingency plans NJNG would have available if the permanent regulator were not to be installed."

Mosley also testified that the record was unclear as to whether NJNG had explored if it could keep the temporary regulator and install only a heating unit at another location, why Panaccione proposed the regulator station to be set back 180 feet from Holmdel Road and not some other measurement, or why NJNG proposed installing a natural gas fired heater instead of other heaters that produce less emissions, like the catalytic heaters that NJNG uses at other locations.  He explained that, although it had not been performed, "a hydraulic analysis would surely identify a certain point or location elsewhere . . . on the system where heating equipment could be located and sill [sic] prevent operational issues . . . from occurring at the temporary regulator . . . ."  Mosley further questioned whether the sixteen-inch pipeline "was sized solely for Holmdel, or if it is sized for other markets and/or future growth that NJNG anticipated at the time of planning . . . ."  He testified that due to the inadequate information provided by NJNG, he could not make firm conclusions on its

23

proposal. He added, "it's not apparent that the continued use of the temporary regulator, either in its current location, or installed at an alternate location[,] would not meet the ongoing load requirements of Holmdel."

Mosley also testified as to the proposed regulator station's impact on New Jersey's EMP goals and the EO100. He opined that, although the proposed regulator station was "not a major addition[,]" NJNG had not adequately considered the EMP and EO100 goals in designing and preparing its Project, especially in assessing "the need for future expansion of its gas system" and proposing "non-pipeline solutions." He explained:

> Every existing and proposed natural gas facility in New Jersey now faces the distinct possibility of becoming underutilized or, in many ways, obsolete as the State implements policies to achieve its ambitious reductions in usage. Utilities refer to such assets as "stranded," and are vitally (and mostly understandably) concerned about having infrastructure that seemed reasonably necessary when constructed but as consumption continues to decline, now become expensive and too large in relation to load served. The EMP and EO[]100 recognize this concern. Regulators are urged to create some means of compensating utilities for these assets that become "stranded" because of changes in regulatory policies. This proceeding is not the appropriate forum for a detailed examination of these issues, but I can say some rather obvious things that should inform the [BPU]'s decision on this appeal.

> First, the best way in which to meet the stranded asset issue head-on is to avoid as often as possible the

A-1582-22

creation of new potentially stranded assets.  Second, if some improvement in infrastructure is absolutely necessary, it should be as minimally scaled as possible. Third, if there is available a means of avoiding any increase in natural gas consumption, by for example making use of electricity or renewable energy, that should be the choice.

At the point at which NJNG asks that its ratepayers assume the costs of this [proposed regulator] [s]tation as a stranded asset, that cost recovery must be denied unless NJNG can prove that at the time it constructed this [s]tation, it did all that it could to avoid this construction altogether, and scaled the [s]tation as minimally as possible, and did all that it could to avoid any increase in natural gas consumption, including using the [s]tation to add new load and using natural gas to provide what heat is needed.

Mosley acknowledged that DEP had not yet finalized the regulatory reforms the 2019 EMP and EO100 required to reduce emissions and integrate climate change considerations.  He nonetheless opined that NJNG should not wait for the outcome of the DEP's process before putting the EMP's goals into effect.  Mosley explained:

We know that the end result of the DEP's process is <u>not</u> going to be an approval of <u>increased</u> emissions; the only question will be <u>how much</u> reduction is mandated and how it is to be achieved.  The [s]tation as proposed will increase greenhouse gas emissions.  Prudent management would reassess the need for the [s]tation and not needlessly incur potential stranded costs.

25

III.

On May 18, 2022, ALJ Pelios issued his initial decision, concluding that NJNG's petition regarding the new site should be granted. ALJ Pelios found: (1) the Project "is reasonably necessary to provide safe, adequate, and reliable natural gas services in New Jersey;" (2) the Project "is reasonably necessary for the service, convenience, and welfare of the public;" (3) NJNG "considered alternative sites and methods for this project;" (4) the proposed site and project design are "reasonable considering the alternatives;" (5) the Project, as designed, "will minimize adverse impacts on the environment;" and (6) "based upon the record, the [P]roject is not adverse to the public health and welfare." ALJ Pelios recommended that NJNG's petition to construct the regulator station at the 960 Holmdel Road site should be granted and that any local rules, ordinances, or regulations promulgated under the MLUL "should not apply to the construction, installation, and operation of the project."

The Township filed exceptions, and NJNG and Rate Counsel[3] filed replies.

---

[3] The Division of Rate Counsel (Rate Counsel) represents the interests of utility ratepayers. N.J.S.A. 52:27EE-46 to -55.

IV.

On December 21, 2022, the BPU issued its final decision, "adopt[ing] the Initial Decision in its entirety and without modification" and granting NJNG's petition. The BPU found, in accordance with N.J.S.A. 40:55D-19, that NJNG had met its burden to demonstrate that the "Project, as proposed, is reasonably necessary to provide safe, adequate, and reliable natural gas services in New Jersey, and is reasonably necessary for the service, convenience, and welfare of the public."

Reviewing that evidence, the BPU agreed with the ALJ's "determinations regarding witness credibility, development of the record, and analysis thereof." It further accepted the ALJ's factual findings that:

> 1. NJNG's panel testimony was credible concerning the need for the Project, that the most reasonable and practical method for heating the regulator is a CWT heater, and that the proposed site was the most reasonable option.
>
> 2. The Project will have little to no material impact on the value of nearby properties.
>
> 3. The Project will have no adverse impact on the area's ambient noise levels or air quality, and will have a negligible impact on the State's overall air quality and greenhouse-gas emissions.
>
> 4. The law-of-the-case doctrine bars re-litigation of the binding effect of the EMP, and EMP Goal 5.4.2 is not

27

implicated in this matter because the Project will address reliability concerns and is not an expansion or improvement project. Further, the Project is consistent with the EMP's goals when considering NJNG's obligation to maintain a reliable and safe natural-gas system.

5. NJNG duly considered Holmdel Township's zoning ordinances and Holmdel's Master Plan when selecting the Project's site.

[(Citations omitted).]

In addition, based upon the ALJ's factual findings, the BPU rejected the Township's argument that the current regulator is adequate so that NJNG's proposed regulator station is not necessary. The BPU's final decision explains that:

[T]he current regulator cannot be equipped with a heater, and as such, [NJNG] operated its system at reduced, suboptimal pressures, continuously in winter months and regularly throughout the year, to mitigate risk of equipment becoming encased in ice. Additionally, [NJNG] reported incidents where high-pressure alarms were triggered and the regulator had to be placed on standby while equipment was rebuilt. The Project will have an above-ground heating unit to prevent the pressure-reducing regulators and other equipment from becoming encased in thick ice. According to NJNG, without a heater, ice encasement could cause station failure, resulting in gas service outages to customers, and devastating consequences to scores of affected customers, especially in the winter. Additionally, [NJNG] considered the costs of the [P]roject as it related to the selection of the heater.

The BPU also rejected the Township's argument that NJNG's proposed regulator station is actually a capacity expansion, rather than reliability project, because the BPU found the evidence supported the ALJ's determination that NJNG's proposed regulator station is not intended to increase system capacity. Similarly, the BPU was not persuaded by the Township's claim that the reductions in natural gas consumption required by the EMP will negate the need for the proposed regulator station, thereby becoming a stranded asset. The BPU found "there is no reason to believe that the Project will not operate into the foreseeable future." Thus, the BPU agreed with ALJ Pelios that NJNG's proposal was "one of necessity because it increases reliability."

Next, the BPU acknowledged that, when determining reasonable necessity under N.J.S.A. 40:55D-19, the factfinder "must also consider 'reasonable, practical, and permanent alternative[s] to the construction' of the proposed facility." (Alteration in original). Pursuant to that requirement, it agreed with the ALJ's finding that NJNG had used reasonable site-selection criteria in considering alternate locations for its proposed regulator station. The BPU noted the record showed that NJNG's site selection process "was in cooperation with property owners, thereby eliminating the need to utilize condemnation which potentially could have further delayed the Project and increased costs

through additional litigation." The BPU further reasoned NJNG's site analysis established that there were no reasonably available alternative sites that would achieve an equivalent public benefit.

Moreover, the BPU noted that the record shows NJNG compared the advantages and disadvantages of many sites and concluded its proposal offered the optimal engineering design and presented the least harmful impacts to residential areas and the environment. Thus, the BPU determined that NJNG had "adequately demonstrated that the proposed location of the Project is reasonable compared to the alternatives, as required by N.J.S.A. 40:55D-19."

In addition, the BPU found the record "reflects that NJNG made good faith attempts to address [the Township]'s concerns [by] moving the proposed location approximately 200 feet from Holmdel Road" and "includ[ing] berms and foliage in its plans to minimize the site's visibility and impact on noise." The BPU also determined the record adequately showed that "the new facility would not generate odor or substantial noise in the surrounding area." It noted that NJNG "would install a sound wall to mitigate any generated noise, and the heater is the only part of the facility that would generate emissions, the majority of which would consist of carbon dioxide and water vapor, with trace amounts of criteria air pollutants" which would not require an air permit from DEP.

30

Additionally, the BPU reasoned that NJNG's witnesses predicted that the emissions would be minimal when compared to the overall emissions generated in New Jersey. It therefore concluded that NJNG's proposal "is not an expansion project and is pivotal for NJNG to provide reliable service," and does not conflict with the state's EMP.

Based on these findings, the BPU approved NJNG's petition, ordering, pursuant to N.J.S.A. 40:55D-19, Holmdel's land use law and any other ordinances, rules, or regulations it promulgated pursuant to the MLUL do not apply to the construction, installation, and operation of NJNG's proposed regulator station and associated heater facility at 960 Holmdel Road, and thus NJNG may construct its Project as proposed.

This appeal followed. The Township raises the following contentions for our consideration:[4]

> POINT I
>
> NJNG Always Has The Burden Of Proof And Persuasion.
>
> POINT II
>
> The Initial Decision And BPU Decision Did Not Consider The Entire Record; They Relied Upon An Arbitrary and Capricious Selection Of NJNG's Pre-

---

[4] To comport with our conventions, we omit certain points.

Filed Direct Testimony And Ignored The Cross Examination Of The NJNG Witnesses.

POINT III

The BPU Decision And Initial Decision Are Fatally Wrong About The Application Of New Jersey's Climate Law To This Proceeding.

A. The Clean Energy Act

B. The Global Warming Response Act

C. The "2019 New Jersey Energy Master Plan: Pathway To 2025"

D. "New Jersey's Global Warming Response Act: 80x50 Report: Evaluating Our Progress And Identifying Pathways To Reduce Emissions By [Eighty Percent] By 2050"

POINT IV

The Proposed Regulator Station Is Not A Reliability Project, But A Costly Stranded Asset In The Making.

POINT V

The BPU Arbitrarily And Capriciously Approved NJNG's Failure To Consider Alternatives.

POINT VI

The BPU And [ALJ] Erred As A Matter Of Law In Ignoring The Decisions Of The [] Zoning Board And Accepted And Relied Upon "Expert" Testimony That Contradicted The Expert Findings Of The [] Zoning Board.

32

NJNG argues:

POINT I

THE [BPU] AND ALJ CORRECTLY APPLIED THE LEGAL STANDARD FOR A PETITION UNDER N.J.S.A. 40:55D-19.

POINT II

THE [BPU]'S EXERCISE OF ITS EXPERTISE AND THE ALJ'S CREDIBILITY FINDINGS ADOPTED BY THE [BPU] ARE ENTITLED TO DEFERENCE.

POINT III

THE [BPU] AND ALJ CORRECTLY FOUND THAT THE REGULATOR STATION IS REASONABLY NECESSARY FOR THE PUBLIC'S SERVICE, CONVENIENCE OR WELFARE

A. The [BPU] and ALJ's Findings of Reasonable Necessity Were Based on Substantial Credible Evidence That The Regulator Station Will Address Freezing Conditions and Minimize the Risk of Equipment Failure and Gas Service Outages.

B. [The Township]'s Arguments Do Not Establish That [T]he [BPU] and ALJ's Necessity Findings Were Erroneous.

1. The [BPU] Considered the Entire Record, and Did Not Err in Relying on Pre-Filed Testimony or in Adopting the ALJ's Fact Findings and Credibility Determinations.

2. [The Township]'s Argument That The Continued Operation of the Temporary Regulator Station Poses "No Risk" to Reliable Service Is Based On a Mischaracterization of the Record.

POINT IV

NJNG CONSIDERED HEATER ALTERNATIVES, AS CORRECTLY FOUND BY THE BOARD AND ALJ.

POINT V

THE REGULATOR STATION, WHICH IS AN ESSENTIAL RELIABILITY PROJECT, IS CONSISTENT WITH THE [EMP] AND OTHER STATE ENERGY POLICIES.

A. The [BPU]'s Interpretation and Application of the EMP, Its Own Planning Document, is Entitled to Deference.

B. The EMP Recognizes the Need for Infrastructure Like the Project that Supports the Reliability of the Existing Gas Transmission and Distribution System.

C. [The Township]'s Arguments Regarding the EMP Are Meritless.

D. [The Township]'s Untimely Objections to the Admissibility of [] Chilton's Testimony Are Meritless.

E. Other New Jersey Energy Policies Did Not Preclude the [BPU] From Approving the Project.

POINT VI

THE REGULATOR STATION WILL NOT GENERATE STRANDED COSTS; IT WILL BE NEEDED FOR THE FORESEEABLE FUTURE.

POINT VII

THE [BPU] AND ALJ PROPERLY CONSIDERED [THE TOWNSHIP]'S COMMUNITY ZONE PLAN AND ORDINANCE.

Rate Counsel argues:

POINT I

THE [BPU] MUST CONSIDER COST IN REVIEWING APPLICATIONS FOR A WAIVER UNDER N.J.S.A. 40:55D-19.

POINT II

RATEPAYERS SHOULD NOT BEAR UNREASONABLE COST INCREASES FOR THE REGULATOR THAT ARE ASSOCIATED WITH [THE TOWNSHIP]'S REQUESTS AND THE RESULTING PASSAGE OF TIME.

POINT III

THE FUTURE OF NATURAL GAS IN THE STATE HAS YET TO BE DECIDED THEREFORE THE TOWNSHIP'S STRANDED ASSET ARGUMENT MUST FAIL.

BPU argues:

POINT I

THE COURT SHOULD AFFIRM THE BPU'S ORDER AS THE PROJECT IS REASONABLY NECESSARY FOR THE SERVICE, CONVENIENCE, AND WELFARE OF THE PUBLIC.

A. The record supports the BPU's determination that the Project is reasonably necessary to provide safe, adequate, and reliable natural gas services.

B. The record supports the BPU's finding that 960 Holmdel Road is the most reasonable site for the Project, considering the alternatives.

C. The Project will have little to no material impact on property values in the vicinity.

D. The record supports the BPU's determination that the Project will not adversely impact the area's ambient noise levels and air quality.

POINT II

THE PROJECT IS CONSISTENT WITH THE ENERGY MASTER PLAN'S GOALS TO MAINTAIN A RELIABLE AND SAFE NATURAL GAS SYSTEM.

V.

Although the Township raises numerous issues, the gravamen of its appeal is that the BPU's decision was arbitrary, capricious, and unreasonable. We begin our analysis by acknowledging the foundational legal principles governing this

36

appeal.  The scope of our review is limited.  In reviewing an administrative agency's decision, a court will generally accord considerable deference to the agency's expertise.  Campbell v. N.J. Racing Comm'n, 169 N.J. 579, 588 (2001).  Relatedly, "[a]n appellate court may reverse an agency decision if it is arbitrary, capricious, or unreasonable."  In re Proposed Quest Acad. Charter Sch. of Montclair Founders Grp., 216 N.J. 370, 385 (2013).  This review is restricted to three inquiries:  (1) whether the action violates any express or implied legislative policies; (2) whether the record contains substantial evidence to support the agency's findings; and (3) whether, in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.  Id. at 385-86 (quoting Mazza v. Bd. of Trs., Police & Firemen's Ret. Sys., 143 N.J. 22, 25 (1995)).

Further, an important question in applying the deferential standard of review to an agency's factfinding is whether "we have 'confidence that there has been a careful consideration of the facts in issue and appropriate findings addressing the critical issues in dispute.'"  In re Thomas Orban/Square Props., LLC, 461 N.J. Super. 57, 77 (App. Div. 2019) (quoting Bailey v. Bd. of Rev., 339 N.J. Super. 29, 33 (App. Div. 2001)).  "The obligation that there be substantial evidence in the record requires a sifting of the record, and the ability

to find support for the conclusions reached by the [agency] under the statutory framework within which [it] must act." Proposed Quest Acad. Charter Sch., 216 N.J. at 387. The reviewing court, however, "will not weigh the evidence, determine the credibility of witnesses, draw inferences and conclusions from the evidence or resolve conflicts therein." In re Recycling & Salvage Corp., 246 N.J. Super. 79, 87 (App. Div. 1991). The burden of demonstrating that the agency's action is reversible "rests upon the [party] challenging the administrative action." In re Adoption of Amends. to N.E., Upper Raritan, Sussex Cnty. & Upper Del. Water Quality Mgmt. Plans, 435 N.J. Super. 571, 583 (App. Div. 2014) (alternation in original) (quoting In re Arenas, 385 N.J. Super. 440, 443-44 (App. Div. 2006)).

The BPU has been vested with broad discretion in the exercise of its authority to regulate utilities. In re Pub. Serv. Elec. & Gas Co.'s Rate Unbundling, Stranded Costs & Restructuring Filings, 167 N.J. 377, 384 (2001); In re Centex Homes, LLC, 411 N.J. Super. 244, 254 (App. Div. 2009). The Legislature tasked the BPU with the "general supervision and regulation of and jurisdiction and control over all public utilities . . . and their property, property rights, equipment, facilities and franchises so far as may be necessary for the purpose of carrying out the provisions of [] Title [48]." N.J.S.A. 48:2-13(a).

More specifically, N.J.S.A. 48:2-23 empowers the BPU to ensure that regulated public utilities:

> [F]urnish safe, adequate and proper service, including furnishing and performance of service in a manner that tends to conserve and preserve the quality of the environment and prevent the pollution of the waters, land and air of this State . . . and to maintain its property and equipment in such condition as to enable it to do so.
>
> [(Emphasis added).]

Further, our Supreme Court has construed this legislative grant of authority "to the fullest and broadest extent." In re Pub. Serv. Elec. & Gas Co., 35 N.J. 358, 371 (1961). See Township of Deptford v. Woodbury Terrace Sewerage Corp., 54 N.J. 418, 424 (1969) ("Our courts have consistently held that the Legislature in Title 48 intended to delegate the widest range of regulatory power over public utilities to the [BPU].").

So too, "[t]he BPU's authority over utilities, like that of regulatory agencies generally, extends beyond powers expressly granted by statute to include incidental powers that the agency needs to fulfill its statutory mandate." Rate Unbundling, 167 N.J. at 384 (quoting In re Valley Rd. Sewerage Co., 154 N.J. 224, 235 (1998)). Thus, the BPU's final determination is generally presumed valid. Id. at 385.

We add that, as with other state agencies, the role of an appellate court when reviewing a BPU decision "is not to substitute our judgment for that of the agency, particularly when that judgment reflects agency expertise." Id. at 384. See Recycling & Salvage Corp., 246 N.J. Super. at 87 ("[I]t is not our function to substitute our independent judgment for that of an administrative agency, such as the [BPU], where there may exist a difference of opinion concerning the evidential persuasiveness of the relevant proofs.").

N.J.S.A. 48:2-43 states that "[a]ny order made by the [B]oard [of Public Utilities] may be reviewed by appeal to the appellate division of the Superior Court." Importantly, for purposes of this appeal, N.J.S.A. 48:2-46 expressly states:

> The Superior Court, appellate division is hereby given jurisdiction to review any order of the [B]oard and to set aside such order in whole or in part when it clearly appears that there was no evidence before the [B]oard to support the same reasonably or that the same was without the jurisdiction of the [B]oard.
>
> No order shall be set aside in whole or in part for any irregularity or informality in the proceedings of the [B]oard unless the irregularity or informality tends to defeat or impair the substantial right or interest of the appellant.
>
> [(Emphasis added).]

Accordingly, on appeal from a BPU order, we must confine our inquiry to whether there exists competent and relevant evidence in the record to furnish a reasonable basis for the BPU's action. "[U]pon the exercise of its broad authority and the conduct of appropriate proceedings, 'the Board's rulings are entitled to presumptive validity and will not be disturbed unless we find a lack of reasonable support in the evidence.'" Rate Unbundling, 167 N.J. at 385 (quotation marks omitted) (quoting In re Jersey Cent. Power & Light Co., 85 N.J. 520, 527 (1981)). Thus, if there is evidence on the issues addressed, no findings made or conclusions reached based on that evidence and are otherwise within the BPU's discretionary authority will be deemed to be arbitrary, capricious or unreasonable. In re N.J. Bell Tel. Co., 291 N.J. Super. 77, 89 (App. Div. 1996).

The MLUL sets forth the specific standard BPU applies when considering a petition filed by a utility company, like the one filed by NJNG here. The MLUL reads, in pertinent part:

> If a public utility . . . is aggrieved by the action of a municipal agency through said agency's exercise of its powers under [(the MLUL)], with respect to any action in which the public utility . . . has an interest, an appeal to the [BPU] . . . may be taken within [thirty-five] days after such action without appeal to the municipal governing body . . . . If, after such hearing, the [BPU] shall find that the present or proposed use by

the public utility . . . of the land described in the petition is <u>necessary for the service, convenience or welfare of the public</u>, including, but not limited to, in the case of an electric power generator, a finding by the [B]oard that the present or proposed use of the land is necessary to maintain reliable electric or natural gas supply service for the general public and that no alternative site or sites are reasonably available to achieve an equivalent public benefit, the public utility or electric power generator may proceed in accordance with such decision of the [BPU], any ordinance or regulation made under the authority of this act notwithstanding.

This act or any ordinance or regulation made under authority thereof, shall not apply to a development proposed by a public utility for installation in more than one municipality for the furnishing of service, if upon a petition of the public utility, the [BPU] shall after hearing, of which any municipalities affected shall have notice, decide the proposed installation of the development in question is reasonably necessary for the service, convenience or welfare of the public.

[N.J.S.A. 40:55D-19 (emphasis added).]

Construing the language in N.J.S.A. 40:55-50, the predecessor to N.J.S.A. 40:55D-19, our Supreme Court held that the BPU must also consider the site, the community zoning plan and zoning ordinances, the plot's physical characteristics, and the surrounding neighborhood. <u>Pub. Serv. Elec.</u>, 35 N.J. at 377. Also, when determining reasonable necessity, the BPU must consider alternative methods and sites and their advantages and disadvantages, including

42

costs.  Ibid.  Further, the BPU must weigh all of the parties' interests, and where those interests are equally balanced, must give the utility preference in light of the Legislature's clear intent that the broad public interest to be served is greater than local considerations.  In re Monmouth Consol. Water Co., 47 N.J. 251, 258 (1966); Pub. Serv. Elec., 35 N.J. at 377.  Our Supreme Court added that "[t]he utility must show that the proposed use is reasonably, not absolutely or indispensably, necessary for public service, convenience and welfare at some location."  Pub. Serv. Elec., 35 N.J. at 377 (emphasis added).  The Court explained:

> This exemption section expresses a legislative intent that, in the zoning field, at least some power over a utility is reserved to a municipality, subject to the supervising authority of the Board to declare the local regulation inapplicable if it determines "the situation of the building or structure in question is reasonably necessary for the service, convenience or welfare of the public."
>
> [Id. at 373-74.]

VI.

Apply the foregoing general principles to the matter before us, the Township has not established a basis upon which we might overturn the BPU's decision to grant NJNG's petition.  We are unpersuaded by the Township's contention the BPU erred by not considering the entire record.  Nor are we

43

persuaded by its argument that the ALJ ignored cross-examination testimony. We find no abuse of discretion in the ALJ's credibility assessments. We reiterate and emphasize that we "will not weigh the evidence, determine the credibility of witnesses . . . or resolve conflicts therein." Recycling & Salvage Corp., 246 N.J. Super. at 87.

We further stress that N.J.S.A. 48:2-46 states that a reviewing court can set aside the BPU's order only "when it clearly appears that there was no evidence before the board to support the same reasonably . . . ." Here, NJNG provided ample evidence to support its petition. Notably, the BPU accepted the ALJ's finding that NJNG's panel of witnesses were "credible as to the need for the proposed facility, [and] that the most reasonable and practical method for heating the regulator is the CWT heater chosen by [NJNG], and that the proposed site was the most reasonable option available on the lot at 960 Holmdel Road." The BPU further found from the evidence "that the Project is one of necessity because it increases reliability."

And contrary to Township's claims, there is no evidence in the record from NJNG's witnesses that its intention was anything other than to increase the safety and reliability of its system by preventing icing at the points where the gas pressure needs to be decreased between the sixteen-inch and ten-inch lines to

44

prevent any possibility of service loss. In reaching this conclusion, we are guided by our Supreme Court's clear instruction in In re Delaware, Lackawanna & Western Railroad Co., where the Court stressed:

> In passing upon the appellants' contentions we must ever bear in mind that ours is not the function of making original factual findings and policy determinations as to whether the operation of the new [regulator station] is necessary and proper for the public convenience and will properly serve the public interest. That function has been appropriately vested by the Legislature in the [BPU] Commissioners which applies its experienced administrative judgment to the subject at hand. Its determination carries with it the presumption of correctness, and on judicial review the court will not substitute its independent judgment for that of the board but will confine its inquiry to the ascertainment of whether the evidence before the board furnished a reasonable basis for its action.
>
> [25 N.J. 353, 356 (1957) (citations omitted) (quoting In re Greenville Bus Co., 17 N.J. 131, 137 (1954)).]

We add that the BPU's expertise is to review and ensure that NJNG furnishes "safe, adequate and proper service . . . and to maintain its property and equipment in such condition as to enable it to do so." N.J.S.A. 48:2-23. The agency properly discharged that function in rendering its final decision.

45

VII.

We next address the Township's contention the BPU erred by not applying New Jersey's climate laws to its decision on NJNG's proposed regulator station.[5] The Township contends the ALJ erred by denying its motion to order NJNG to undertake a formal review of the merits of its proposal measured against the EMP's policies. The ALJ determined that NJNG "should not be required to reassess their petition[s] in light of the general goals of the EMP." He reasoned that:

> [T]he need for definite regulations and standards to first be put in place by the NJDEP, as the designated agency put in charge of proposing and adopting regulations in regard to the EMP, before any reliance on the general declarations within the EMP and EO can impact the proceedings. There is nothing within the []DEP Order or elsewhere that suggests any regulations have been proposed or adopted yet. Because the EMP did not put a moratorium on ongoing and new projects, there is no regulation in place yet that would mandate compliance with the newly unveiled EMP.

---

[5] The Township refers to the 2018 amendment, L. 2018, c. 17 (eff. May 23, 2018) to the Clean Energy Act, N.J.S.A. 48:3-87.9; the Global Warming Response Act, N.J.S.A. 26:2C-37 to -68; the EMP; and the N.J. Dep't of Env't Prot., 2020 New Jersey Global Warming Response Act: 80x50 Report (Oct. 15, 2020).

We note that both the Township and NJNG presented witnesses who gave their opinions on the Project in the context of the EMP. Mosley testified for the Township that the NJNG's proposed regulator station does not meet the EMP's Goals 5.4.1 and 5.4.2 to assess the need for future expansion of the gas system and to propose and adopt non-pipeline solutions. On rebuttal, Chilton testified for NJNG that the regulator station was not an expansion of the gas system, as discussed in Goal 5.4, but rather equipment necessary to maintain the reliability of NJNG's existing sixteen-inch transmission line and ten-inch distribution line. Chilton explained that achieving the EMP's goals will be a gradual process and NJNG cannot abandon or lessen the reliability of its system during that time because a public utility is required by law to provide "safe, adequate, and proper service."

The ALJ found that, although "both Mosley and Chilton were credible witnesses," Chilton's testimony was "more thorough and detailed" and persuasive. The law is well-settled that when reviewing the testimony of experts, the ALJ as the factfinder, has "the prerogative to evaluate the credibility of the testimony of the competing experts" and to find one expert's testimony more credible than another expert's testimony. N.J. Div. of Child Prot. & Permanency v. M.M., 459 N.J. Super. 246, 258 (App. Div. 2019) (citing City of

47

Long Branch v. Liu, 203 N.J. 464, 491 (2010)). Furthermore, "[t]he choice of accepting or rejecting testimony of [expert] witnesses rests with the administrative agency, and where such choice is reasonably made, it is conclusive on appeal." Oceanside Charter Sch. v. N.J. State Dep't of Educ., 418 N.J. Super. 1, 9 (App. Div. 2011) (quoting In re Howard Sav. Bank, 143 N.J. Super. 1, 9 (App. Div. 1976)). Accord Renan Realty Corp. v. State, Dep't of Cmty. Affs., Bureau of Hous. Inspection, 182 N.J. Super 415, 421 (App. Div. 1981). Here, the BPU fully embraced the ALJ's assessment of the experts' credibility.

Importantly, moreover, the BPU found that the record showed that the heater, due to its "limited emissions," was "not considered a significant source of air pollutants and does not require an air permit per Environmental Protection Agency and DEP regulations" The BPU therefore determined:

> Though reducing greenhouse gas emissions and other air pollutants is a stated goal and mandate set forth in the 2019 EMP, the proposed facility's emissions would be minimal compared to the overall emissions generated in the State. Lastly, the Project is not an expansion project and is pivotal for NJNG to provide reliable service. The Project, therefore, does not conflict with the sub-goals of Goal 5.4 of the EMP.

We reiterate and amplify that the BPU did not act arbitrarily, capriciously, or unreasonably in finding that NJNG's proposed regulator station and heater is

"reasonably necessary" as an interim measure because it increases reliability. That finding is consistent not only with N.J.S.A. 48:2-23, which requires utilities to provide safe, adequate, and proper service to customers, but also the EMP's policy goal that gas utilities must "continue to deliver reliable, resilient, and affordable service" in a manner that "meets the immediate needs of New Jersey's gas consumers."[6] We add that under the Time of Application (TOA) Rule[7], the Project's environment impact should be measured by the standards and requirements in place at the time of NJNG's petition, not emission goals that are

---

[6] The EMP's Strategy 5 states in pertinent part that gas utilities must "continue to deliver reliable, resilient, and affordable service" in a manner that "meets the immediate needs of New Jersey's gas consumers" while realizing the State's goals to achieve "[one hundred percent] clean energy and an [eighty percent] reduction in greenhouse gas emissions" from 2006 levels by 2050.

[7] N.J.S.A. 40:55D-10.5 replaced the TOA Rule. It provides:

> Notwithstanding any provision of law to the contrary, those development regulations which are in effect on the date of submission of an application for development shall govern the review of that application for development and any decision made with regard to that application for development. Any provisions of an ordinance, except those relating to health and public safety, that are adopted subsequent to the date of submission of an application for development, shall not be applicable to that application for development.

> [N.J.S.A. 40:55D-10.5.]

A-1582-22

to be achieved in the future.  Cf. Hoboken for Responsible Cannabis, Inc. v. City of Hoboken, 480 N.J. Super. 357, 374-78 (App. Div. 2024).

In short, we have no basis upon which to overturn the BPU's determination that because the transition away from using natural gas will be a gradual process, NJNG must still fulfill its duty to provide reliable service which, the BPU found, necessitates addressing the icing issue.

VIII.

Finally, in the interests of completeness, we address the Township's contention the BPU erred by agreeing with NJNG's assertion that its proposed regulator station is a reliability project, and not a costly future stranded asset[8] that will overburden the ratepayers.  The ALJ found that NJNG's panel was credible when they testified that the regulator station and heater will not be stranded costs because even as the State moves to one hundred percent electricity-based energy and phases out the use of natural gas pursuant to the EMP, NJNG will still need to reduce the pressure between transmission and distribution lines.  BPU concurred with the ALJ that NJNG's Project does not increase system capacity and, therefore, is not part of an expansion project.  We

---

[8]  Chilton testified that the general meaning of a stranded cost is "a piece of equipment that's no longer needed" but which still presents "unamortized costs on the books of the utility."

have no basis to second guess that finding, which is supported by ample evidence in the record. NJNG's panel testified that the proposed regulator station is needed for the foreseeable future to reliably reduce pressure, even assuming gas demand declines. Chilton testified that the proposed regulator station will have a useful life of at least twenty years. And Santhana acknowledged that many Holmdel "residents, business[es] and public facilities" rely on, and will continue to rely on, "natural gas for all or a portion of their energy needs . . . ."

In sum, we are satisfied that the BPU did not act arbitrarily, capriciously, or unreasonably in discharging its function to review NJNG's petition and the evidence adduced during the evidentiary hearings. To the extent we have not specifically addressed them, any remaining arguments raised by the Township lack sufficient merit to warrant discussion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Hanley

Clerk of the Appellate Division

A-1582-22